UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADAM MALIK,

        Plaintiff,

    v.

DEPARTMENT OF HOMELAND
SECURITY, et al.,

        Defendants.

Civil Action No. 22-0698 (CRC)

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT THEREOF**

## <u>TABLE OF CONTENTS</u>

**BACKGROUND** ............................................................................................................. 1

I.      January 3, 2021, Incident and Government Distrust ................................................ 1

II.     FOIA Requests ....................................................................................................... 2

        A.     CBP ............................................................................................................. 2

        B.     USCIS, ICE, and FBI ................................................................................ 4

        C.     The Archives .............................................................................................. 6

III.    Lawsuit ................................................................................................................... 7

**LEGAL STANDARDS** .................................................................................................. 7

**ARGUMENTS** ............................................................................................................... 7

I.      The Agencies Adequately Searched for Responsive Documents ........................... 7

        A.     CBP ............................................................................................................. 8

        B.     USCIS ........................................................................................................ 9

        C.     ICE ............................................................................................................ 11

        D.     FBI ............................................................................................................ 12

        E.     The Archives ............................................................................................ 14

II.     Exemption 3 ......................................................................................................... 15

        A.     CBP .......................................................................................................... 16

        B.     USCIS ...................................................................................................... 16

III.    Exemption 5 – Deliberative Process Privilege .................................................... 17

        A.     CBP .......................................................................................................... 18

        B.     USCIS ...................................................................................................... 19

        C.     FBI ............................................................................................................ 20

IV.    Exemption 5 – Attorney Client Privilege ........................................................... 22

        A.     CBP .......................................................................................................... 22

B.      USCIS ................................................................................................23

V.      Exemption 7 – Law Enforcement Purpose ...................................................... 23

VI.     Exemption 7(C) ................................................................................................ 24

        A.      CBP ....................................................................................................25

        B.      USCIS ................................................................................................26

        C.      ICE ....................................................................................................28

        D.      FBI ....................................................................................................28

VII.    Exemption 6 ..................................................................................................... 28

        A.      USCIS ................................................................................................29

        B.      CBP, USCIS, ICE, and FBI ..............................................................30

VIII.   Exemption 7(E) ................................................................................................ 30

        A.      CBP ....................................................................................................31

        B.      USCIS ................................................................................................33

        C.      ICE ....................................................................................................34

        D.      FBI ....................................................................................................34

IX.     The Agencies Adequately Segregated All Reasonably Segregable
        Information ....................................................................................................... 35

X.      The FBI's Glomar Response............................................................................. 35

**CONCLUSION** ...................................................................................................... **37**

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................... 7

*Blackwell v. FBI*,
646 F.3d 37 (D.C. Cir. 2011)....................................................................................... 30

*Boyd v. Dep't of Just.*,
475 F.3d 381 (D.C. Cir. 2007)....................................................................................... 8

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*,
854 F.3d 675 (D.C. Cir. 2017)..................................................................................... 25

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980)..................................................................................... 18

*Dalal v. Dep't of Just.*,
Civ. A. No. CV 16-1040 (TJK), 2022 WL 17092863 (D.D.C. Nov. 21, 2022) ........................ 36

*Dudman Commc'ns Corp. v. Dep't of Air Force*,
815 F.2d 1565 (D.C. Cir. 1987)................................................................................... 18

*Elec. Priv. Info. Ctr. v. Dep't of Just.*,
18 F.4th 712 (D.C. Cir. 2021)...................................................................................... 24

*Evans v. Fed. Bureau of Prisons*,
951 F.3d 578 (D.C. Cir. 2020)....................................................................................... 7

*Fish & Wildlife Serv. v. Sierra Club, Inc.*,
592 U.S. 261 (2021).................................................................................................... 18

*Jud. Watch, Inc. v. Dep't of Treasury*,
802 F. Supp. 2d 185 (D.D.C. 2011).............................................................................. 22

*Lewis v. Dep't of Treasury*,
851 F. App'x 214 (D.C. Cir. 2021)............................................................................... 35

*Mayer Brown LLP v. IRS*,
562 F.3d 1190 (D.C. Cir. 2009)................................................................................... 30

*Mead Data Cent., Inc. v. Dep't of Air Force*,
566 F.2d 242 (D.C. Cir. 1977)..................................................................................... 35

*Medina-Hincapie v. Dep't of State*,
700 F.2d 737 (D.C. Cir. 1983)..................................................................................... 17

*Nat'l Archives & Recs. Admin. v. Favish*,
541 U.S. 157 (2004) ........................................................................................ 24

*Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) .................................................................................. 17, 18

*New Orleans Workers' Ctr. for Racial Just. v. USCIS*,
373 F. Supp. 3d 16 (D.D.C. 2019) ................................................................. 24

*Oglesby v. Dep't of Army*,
920 F.2d 57 (D.C. Cir. 1990) ........................................................................... 8

*Pinson v. Dep't of Just.*,
313 F. Supp. 3d 88 (D.D.C. 2018) ............................................................ 28, 30

*Reps. Comm. for Freedom of the Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) .......................................................................... 18

*Roseberry-Andrews v. Dep't of Homeland Sec.*,
299 F. Supp. 3d 9 (D.D.C. 2018) ................................................................... 22

*Shapiro v. Dep't of Just.*,
40 F.4th 609 (D.C. Cir. 2022) .......................................................................... 8

*Sussman v. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) ...................................................................... 35

*Tax Analysts v. IRS*,
294 F.3d 71 (D.C. Cir. 2002) .......................................................................... 24

*Waterman v. IRS*,
61 F.4th 152 (D.C. Cir. 2023) ................................................................... 17, 18

**STATUTES**

49 U.S.C. § 114 .............................................................................................. 16

5 U.S.C. § 552 ......................................................................................... passim

8 U.S.C. § 1202 .............................................................................................. 16

**RULES**

Fed. R. Civ. P. 56 .......................................................................................... 1, 7

**REGULATIONS**

49 C.F.R. 1520.5 ............................................................................................ 16

iv

Defendants, various federal agencies, respectfully move for summary judgment under Federal Rule of Civil Procedure ("Rule") 56 and Local Civil Rule ("Local Rule") 7(h) against Plaintiff Adam Malik's claims under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

## BACKGROUND

### I.    <u>January 3, 2021, Incident and Government Distrust</u>

According to his complaint, "Plaintiff is a licensed attorney in the State of Texas and has built a practice of representing individuals in U.S. Immigration and Naturalization matters, including matters brought against Defendants and in removal proceedings." Compl. ¶ 23, ECF No. 1. "Plaintiff occasionally represents clients in criminal and nation [sic] security investigations." *Id.* "Plaintiff also represents, and has represented in the past, clients who are under investigation by the FBI." *Id.*

According to Plaintiff, he "has also been previously targeted, for many years, by the Defendants in an effort to discriminate, harass, embarrass, retaliate, scare, and/or seek retribution against [him] for the work that he does and for other reasons." *Id.* ¶ 24. He claims that he "has also been targeted due to his national origin, religion, race, ethnicity and other inherent characteristics." *Id.* Generally, Plaintiff does not trust the government. *See, e.g.*, *id.* ¶ 42 ("CBP has a long history of troubling enforcement tactics and mistreatment of people in its custody."), *id.* ("CBP created and operates with a 'secret division' to target Americans and violate their constitutional and civil rights with a free pass at the borders."), *id.* ¶ 49 ("The FBI has had a long and problematic history with targeting and surveilling people of the Muslim faith.").

On January 3, 2021, "Plaintiff was attempting to reenter the United States after travel to Costa Rica." *Id.* ¶ 30. "Plaintiff attempted to reenter through a Global Entry kiosk located at the Dallas-Fort Worth International Airport." *Id.* He alleges that he was "rejected entry at the kiosk and transferred to an in-person primary inspection, and then to a secondary inspection area." *Id.*

He alleges that he was confronted by three officers in the secondary inspection area who interrogated him, seized his cell phone, searched his cell phone, assaulted him, and "created derogatory reports" against him to "create irreparable harm" to him and his family "in U.S. Government databases." *Id.* ¶¶ 30-41.

## II.   <u>FOIA Requests</u>

In response to the January 3, 2021, incident above, Plaintiff submitted FOIA requests to several agencies, five of which are defendants in this lawsuit: (1) United States Customs and Border Protection ("CBP"), (2) United States Citizenship and Immigration Services ("USCIS"), (3) United States Immigration and Customs Enforcement ("ICE"), (4) the Federal Bureau of Investigation ("FBI"), and (5) the National Archives and Records Administration (the "Archives" or "NARA").

### A.   CBP

Plaintiff made his first request to CBP around January 7, 2021, and he requested the following:

1.   All information pertaining to the seizure of my iphone at DFW airport on January 3, 2021.

2.   All information pertaining to the use and handling of my iphone.

3.   All the information pertaining to the use and handling of the information obtained from and/or through my iphone.

4.   The information obtained from and/or through my iphone.

5.   All information regarding the destruction of information obtained from and/or through my iphone.

6.   All information pertaining to the Filter Team's review of information obtained from and/or through my iphone.

7.   All information pertaining to CBP's coordination of the review of the above information with the US Attorney's Office.

8.   All information pertaining to the revocation of my Global Entry.

9.   All information pertaining to my selection for secondary inspection at the DFW airport on January 3, 2021.

10.  All emails pertaining to me since December 20, 2020.

Suzuki Decl. ¶ 5.

On March 22, 2021, Plaintiff submitted his second request, which sought the following:

"[a] copy of the video(s) from all cameras located at the DFW airport's CBP secured area from January 03, 2021, that show Officer Brock Allen and Supervisory Officer Aaron Sullivan escorting the subject (Adam Malik, **/**/1977)[1] from the secondary inspection area on the second floor to the exit on the first floor, where Supervisory Officer Aaron Sullivan became aggressive and assaulted Mr. Adam Malik from behind."

Suzuki Decl. ¶ 10.

On June 8, 2021, Plaintiff submitted a third request. The third request sought similar information to what he listed in the improper appeal of his second request:

1.   Information or document(s) that references the protocol or the rule regarding the keeping of the video records at the CBP secure locations inside the airports in general and DFW airport terminal D (Immigration and Customs inspection area) specifically.

2.   Information or document(s) that names the agency or entity, other than CBP, that may have a copy of the camera recordings from DFW airport's CBP secured area terminal D from January 03, 2021, approximately around 21:17 CST.

3.   The Standard Operating Procedures (SOP) on how the video records are kept, handled, held, retained, transferred, entrusted, or saved by/with a separate/different agency/entity, specifically for CBP DFW airport. Or what happens to the video recordings at the DFW airport's CBP secured area terminal D from January 03, 2021, approximately around 21:17 CST (Immigration and Customs inspection area) when they are no longer "retained."

4.   Information or document(s) that name(s) of the agency/office/ department/ individual/ entity that may have a copy of the video that is subject of this foia, or the name(s) of the agency/office/department/individual/entity that is the custodian of the records that includes the video from DFW airport's

---

[1]   The month and day of this birth date have been changed to asterisks pursuant to Rule 5.2.

CBP secured area terminal D from January 03, 2021, approximately around 21:17 CST.

Suzuki Decl. ¶ 16.

On February 8, 2022, the Plaintiff submitted a fourth request:

Subject of this FOIA request is Adam Malik (DOB **/**/1977).

1.     Copies of all applications made by the subject for Global Entry Applications.

2.     Any information, documents, records related to the subject's Global Entry Applications.

3.     Any notes or records created by CBP employees or contractors related to the Global Entry account or membership.

4.     Any and all information, data, records, notes, documents, logs that were considered AND became the basis the revocation of the subject's Global Entry membership.

5.     Copy of the report or log that was created by Supervisory CBP Officer Aaron Sullivan out of DFW airport that was also considered as the basis of the revocation for the subject's Global entry."

Suzuki Decl. ¶ 20.

**B.     USCIS, ICE, and FBI**

Plaintiff also submitted a FOIA request dated March 8, 2021, to USCIS, ICE, and the FBI.

The request was the same for each agency and read as follows:

First, I request for the Information Technology department to search its email systems and/or other communications methods and provide me with copies of the records that result from the search pertaining to me based on the following criteria.

The information requested includes but is NOT limited to the following independent parameters.

1.     The time frame for this request is between Jan 2002 until the date search is executed.

2.     This is to include any communication where my name appears in the subject line or within the body of the communication.

3.      This is to include ALL variations of my name as "Aman" or "Aman Malik" or "Adam Malik" or "Adam A Malik" or "Adam Arman Malik" or "Attorney Malik" or "Attorney Adam Malik".

4.      This is to include communication from any account/account holder. (An example of an account is an email address.)

5.      This is to include communication to any account/account holder. (An example of an account is an email address.)

6.      This request includes all email account addresses that end with "@uscis.dhs.gov", "@dhs.gov", "@uscis.gov" or any other domain extensions used by the preceding agencies or times.

7.      This is to include all accounts AND email account, which any individual that works for or at the United States Citizenship and Immigration Services, uses or has access to.

8.      This request includes any entities, individuals, or organization, contractors that either work directly or indirectly with the agency or department.

9.      This request includes ALL folders within an account or email mailbox, which includes but is not limited to the following:

      a.      This request is NOT limited to the "inbox" Folder.

      b.      This request is NOT limited to the "Sent" Folder.

      c.      This request is NOT limited to the "Draft" Folder.

      d.      This request is NOT limited to the "Junk" Folder.

      e.      This request is NOT limited to the "Deleted" Folder.

      f.      This request is NOT limited to the "Deleted Items" Folder.

      g.      This request is NOT limited to the "Junk Email" Folder.

      h.      This request is NOT limited to the "Archived Email" Folder, other otherwise archived emails.

      i.      This request is INCLUDES any other folder that exist in each account/email mailbox.

      j.      This request is INCLUDES any other folder that are created by a user in each account/email mailbox.

10.     This request includes retrieval and restoring of items that have been deleted from the "deleted items" folder.

11.    This request includes retrieval and restoring of items that have been deleted from any of the folder within the account/email mailbox.

Secondly, to the request above to the IT department, I also make the following request to the FOIA/PA officer.

Provide to me with copies of any documents, records, information, and files, whether digital or physical, pertaining to myself and in reference to the following:

1.    All documents contained within or related to my Personal file and/or Human Resource file kept by the department and the agency.

2.    All document related to my employment applications and/or employment with the department and the agency.

3.    All documents related to my background and security checks in reference to my employment with the department or the agency.

4.    All documents, records, information, and files kept related to me kept by the department or the agency.

*See* Panter Decl. ¶ 8; Pineiro Decl. ¶ 8; Seidel Decl. ¶ 12 (emphasis in original omitted)

### C.    The Archives

On June 8, 2021, Plaintiff submitted the following request to the National Personnel Records Center, Civilian Personnel Records ("Personnel Records Center"):

a copy of all and complete documentation and information related to my federal service with the United States Department of Homeland Security. This request includes, but is not limited to, my personal file, background and security clearance, medical records, and any other information or records held in relation to my employment.

Scanlon Decl. ¶ 10.

Plaintiff provided his current name (Adam Malik), "full name used during Federal employment" (Aman Malik), date of birth, social security number, and name and location of employing federal agency (U.S. Immigration and Customs Enforcement; U.S. Citizenship and Immigration Services). *Id.* Plaintiff also listed the beginning and ending dates of federal service as "01/01/08 until 12/31/20212)" (sic), which the Archives presumed meant December 31, 2012. *Id.*

6

III.   **Lawsuit**

On March 14, 2022, Plaintiff filed suit in this Court. *See generally* Compl. To respond to Plaintiff's requests, the agencies referred parts of each request to each other and consulted with one another, the extent of which is provided in the accompanying declarations and *Vaughn* indexes.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Id.* Although all inferences are taken in a light most favorable to the nonmoving party, a party opposing summary judgment may not rest on allegations or denials from its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 255-56. In a FOIA case, summary judgment may be granted "on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020) (citation omitted).

## ARGUMENTS

I.   **The Agencies Adequately Searched for Responsive Documents**

"To prevail on summary judgment, an 'agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested,' which it can do by submitting '[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files

likely to contain responsive materials (if such records exist) were searched.'" *Shapiro v. Dep't of Just.*, 40 F.4th 609, 612-13 (D.C. Cir. 2022) (citations omitted). "In a FOIA case, a district court is not tasked with uncovering 'whether there might exist any other documents possibly responsive to the request,' but instead, asks only whether 'the search for [the requested] documents was adequate.'" *Id.* at 613 (citation omitted). "[T]he fact that a particular document was not found does not demonstrate the inadequacy of a search." *Boyd v. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007). "There is no requirement that an agency search every record system[,]" only the systems that are "reasonably expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

### A.   CBP

CBP's response to Plaintiff's request was led by its FOIA Division, which is the office responsible for reviewing FOIA requests, determining whether records exist, and, if so, whether and to what extent they can be released under FOIA, as well as its FOIA Appeals and Policy Branch, which is responsible for adjudicating administrative appeals that concern FOIA requests and overseeing CBP activities related to information disclosure under FOIA. Although the FOIA Division and the Branch generally have no direct access to records that may be responsive to a request, they determine which CBP component offices are likely to have responsive information and work with those offices to gather any potentially responsive records. Based on the FOIA Division's and the Branch's familiarity, experience, and knowledge with the types of records that each office maintains, an assessment is made as to where responsive records are likely to be maintained based on a review of the content of the request itself and the nature of the records sought, as well as discussions with knowledgeable agency personnel. Accordingly, when CBP receives a FOIA request that reasonably describes the records requested and complies with the agency's rules governing the procedures for FOIA requests, the office likely to have responsive

information is tasked with searching for and retrieving potentially responsive records based on their knowledge of the records maintained by the office and their understanding of the information being requested.

In response to Plaintiff's requests and appeals, multiple attorneys in the Appeals and Policy Branch searched for records in relevant CBP systems of record using the name and date of birth provided by Plaintiff. Suzuki Decl. ¶¶ 23-29. These systems included, for example, the TECS platform, which "is an overarching law enforcement information collection, analysis, and sharing environment that securely links telecommunications devices and personal computers to a central system and database," and the Global Enrollment System platforms, which "is an official system of records for CBP's trusted traveler programs that facilitates enrollment and continued membership in such programs." *Id.* Additionally, attorneys in the Branch consulted with the appropriate CBP offices which had relevant subject-matter experts where other responsive records were likely to have been created and maintained, including the Dallas Fort Worth Office of Field Operations. *Id.* CBP personnel conducting the search were familiar with relevant CBP databases in which relevant data could be found, and searched those accordingly to locate responsive records that were then provided to Plaintiff. *Id.*

### B. USCIS

In response to Plaintiff's request, personnel in the USCIS National Records Center determined that based on the information being sought, a portion of records responsive to Plaintiff's request in USCIS's control and subject to the FOIA would be in Plaintiff's Alien-File ("A-File"). Panter Decl. ¶¶ 20-25. The A-File serves as the official record of an individual's immigration history. *See* 82 Fed. Reg. 43556 (September 18, 2017). Although USCIS is the official custodian of all A-Files, these files are shared with U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection, all of which create and contribute documents to the A-

Files. Panter Decl. ¶¶ 20-25. A-Files are maintained under and retrievable by reference to an individual's name and Alien number, along with date of birth, or combination thereof.

In response to Plaintiff's FOIA request, personnel from the USCIS National Records Center ran a computerized database search in DHS's file tracking system, RAILS, using information provided in his request letter including his name and date of birth. *Id.* The National Records Center determined that two A-Files existed that contained records responsive to Plaintiff's request. *Id.* The National Records Center scanned the records into the its FOIA Immigration Records System called "FIRST." FIRST is a computerized FOIA processing system that allows National Records Center staff to review records and process FOIA requests electronically. *Id.*

Based on the other portions of Plaintiff's request seeking background security records and employment records, the National Records Center requested that the Office of Investigations, the Human Resources Operations Center, and the Office of Equal Opportunity and Inclusion conduct searches for records relying upon Plaintiff's FOIA request. *Id.* Following the searches, the Office of Investigations reported that it did not locate any security or background records and it was believed that any such records were beyond the date established for retention. *Id.*

Regarding employment records, the Human Resources Operations Center noted that given the date of Plaintiff's last day of employment at USCIS as November 9, 2009, such records would have been transferred to the Archives. However, the Human Resources Operations Center located copies of Plaintiff's SF-50 and SF-52 which they provided to the USCIS National Records Center for scanning into FIRST. The Office of Equal Opportunity and Inclusion did not locate any responsive records. The National Records Center subsequently learned from the Office of Investigations that a separate office, the Office of Security and Integrity, may have responsive records as that office handled security and background records at the time that Plaintiff was

employed with USCIS. That office subsequently searched and located responsive records regarding Plaintiff's prior security and background investigation. These records were provided to the National Records Center for processing. *Id.*

In response to Plaintiff's request for email searches, USCIS's Office of Information Technology searched email accounts of individuals that Plaintiff provided as follows: Oscar Garcia, Tracy Tarango, Wilhelm Bierman, Lisa McElrath, Tony Bryson, Lisa Kehl and Jill Ennis, and Clint Hodges, Kristy Sheive and FDNS Greg Harris for the period specified by Plaintiff using the names Plaintiff supplied as follows "Aman" or "Aman Malik" or "Adam Malik" or "Attorney Adam Malik." Responsive records were located and scanned into FIRST. *Id.*

### C. ICE

After reviewing the FOIA requests, the ICE FOIA Office determined that because of the subject matter of Plaintiffs' FOIA Requests, five of its components—Enforcement and Removal Operations, Homeland Security Investigations, the Office of Human Capital, the Office of the Chief Information Officer, and the Office of Professional Responsibility—were the program offices likely to have responsive records (if such records existed). Pineiro Decl. ¶¶ 23-28. Therefore, based on their subject matter expertise and knowledge of the agency record systems, the ICE FOIA Office instructed these program offices to conduct a comprehensive search for records and to provide all potentially responsive records located during that search to the ICE FOIA Office for review and processing. *Id.*

Enforcement and Removal Operations is responsible for arrest and removal of aliens, managing ICE detention operations and providing medical and mental health care to persons in ICE custody. *Id.* Homeland Security Investigations is the principal investigative arm of the Department of Homeland Security, responsible for investigating transnational crime and threats, specifically those criminal organizations that exploit the global infrastructure through which

11

international trade, travel, and finance move. *Id.* The Office of Human Capital provides strategic programs, client services and workforce relations support to ICE employees. *Id.* That office also provides oversight and guidance to ICE's managers, ensuring compliance with human resources policies and practices. *Id.* The Office of the Chief Information Officer is responsible for providing information technology services and products that enable ICE to meet its mission. *Id. T*he Office of Professional Responsibility upholds the agency's professional standards through a multi-disciplinary approach of security, inspections, and investigations to promote organizational health, integrity, and accountability across the agency. *Id.* That office further promotes organizational integrity by vigilantly managing ICE's security programs, conducting independent reviews of ICE programs and operations, and impartially investigating allegations of employee and contractor misconduct. *Id.*

ICE performed an adequate search, as more fully explained in the declaration.

## D.   FBI

As indicated in the declaration of Seidel, the FBI determined that a search of the Central Records System and automated indices, available within Sentinel via the Sentinel search function represented the most reasonable means for the FBI to locate records potentially responsive to Plaintiff's FOIA request. Seidel Decl. ¶¶ 41-46. This is because these general indices provide access to a comprehensive, agency-wide set of indexed data on a wide variety of investigative and administrative subjects and consist of millions of searchable records that are updated daily with newly indexed information. *Id.* In addition, because the requested subject matter would have been indexed after the implementation of Sentinel, the FBI determined that any records would be located using the Sentinel search function. *Id.*

Further, the FBI took the extraordinary step of conducting a targeted search outside of the Central Records System to try to locate files specific to Plaintiff's Special Agent and Contract

Linguist applications. *Id.* On August 2, 2022, the FBI, via its Record Information Dissemination Section, contacted the Human Resources Division to search for records regarding Plaintiff's Special Agent and Contract Linguist applications. *Id.* The Human Resources Division located the same evidence that files existed at one time but did not locate any documents. *Id.* The Human Resources Division advised that all information from 2015 and older would have been removed from their digital records due to the implementation of a new human resources system in late 2015. *Id.* On August 4, 2022, the FBI contacted the Security Division regarding Plaintiff's Special Agent and Contract Linguist applications. *Id.* The Security Division advised that they did not locate any responsive files. *Id.* On January 11, 2023, the FBI reached out to the Information Management Unit regarding Plaintiff's Special Agent application, who advised that the applicant was discontinued on October 5, 2005. *Id.* Per 2011 Records Management Policy, unsuccessful applicant files, wherein no appeal or litigation had been filed, could be destroyed five years after the applicant case had been deactivated. Based on this 2011 retention policy, an applicant file from 2005 would not likely exist. *Id.* On January 18, 2023, the FBI contacted the Dallas Field Office to locate the Contract Linguist physical file. *Id.* The Dallas Field Office advised they were unable to locate a file. On February 7, 2023, the FBI contacted the Electronic Official Personnel Folder (or "eOPF") Unit, who searched their digital database for Adam Malik and Aman Malik and did not locate any responsive records. *Id.*

Plaintiff has provided no information for the FBI to reasonably conclude that records responsive under the FOIA or the Privacy Act would reside outside the Central Records System. *Id.* The Central Records System search indicated that additional responsive applicant records once existed, but a targeted search did not locate them. *Id.* The FBI determined that, based on the age of the applicant records, the records would no longer exist. *Id.* Plaintiff has provided no

information that any other records would reside in any other FBI system or location. *Id.* Therefore, there is no basis for the FBI to conclude that a search elsewhere would reasonably be expected to locate responsive records subject to FOIA. *Id.*

E.    **The Archives**

As explained in the Scanlon declaration: the National Personnel Records Center and Civilian Personnel Records use the following process to search and respond to any requests for Official Personnel Folders and medical records:

> The FRC Program utilizes a web-based IT system known as the Archives and Records Centers Information System ("ARCIS"), which, among other things, allows NARA and its federal agency customers to transact business and maintain intellectual control over the customer agency's material in NARA's physical custody. When OPFs and civilian medical records are received by [the Personnel Records Center], a "Registry Number" is assigned to each individual record. Registry numbers are assigned sequentially upon receipt, and, along with the former employee's full name, social security number, and date of birth, are entered into ARCIS. Any query of ARCIS that uses the correct identifying information will provide [Personnel Records Center] personnel with the registry number and location of the record. Without complete identifying information, locating the proper record from among the 100 million records in our holdings is extremely difficult, time consuming, and, in some cases, impossible.

> A CPR Archives Technician uses the identifying information provided in a request to check ARCIS and determine if CPR has a record location listed. If ARCIS returns a record location, a CPR employee will search the location to determine if there is a physical record on the shelf. If the file has been checked out, there should be "charge-out" information for that file. "Charge-out" information indicates that an agency had requested and been provided the particular OPF and/or medical record. If the record is charged out to an agency, a CPR Correspondence Technician will advise the requester where the folder was sent, and when, and will provide contact information for the relevant agency so that the requester can make the request directly to thee agency.

> If a physical record is located at CPR, the Correspondence Technician assigned to the request reviews the record to determine if it is responsive to the request. If the record is responsive, the technician reviews the request to determine how to respond to the request based on the requirements of OPM regulations as incorporated into NARA's processes.

Scanlon Decl. ¶ 10.

With respect to Plaintiff's specific request and after searching as described directly above, Civilian Personnel Records located Plaintiff's eOPF. There were no medical records or other responsive records located. Civilian Personnel Records determined that the request could be treated as a request for records by the Plaintiff about himself, rather than treated as a FOIA request (meaning that fewer responsive records would be subject to\withholding). Civilian Personnel Records responded to Plaintiff by letter dated November 18, 2021. The response included a copy of Plaintiff's Official Personnel Folder. Of the Official Personnel Folder's forty-seven pages, forty-three pages were released in full and four pages were redacted to remove third party dates of birth, addresses, and a phone number. On October 13, 2022, Civilian Personnel Records retransmitted the file to Plaintiff via email. To date, Civilian Personnel Records has not heard further from Plaintiff.

## II.   **Exemption 3**

FOIA does not apply to matters that are "specifically exempted from disclosure by statute . . . if that statute:

> (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

> (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph."

5 U.S.C. § 552(b)(3). Exemption 3 "differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Carter*, 962 F. Supp. 2d at 138 (citation omitted). "In other words, [an agency] 'need

only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute.'" *Id.*

A. **CBP**

CBP applied Exemption 3 on two separate records released to the Plaintiff on June 29, 2022. The first record is the Risk Assessment Worksheet dated July 28, 2014, and the second record is the Traveler Enforcement Compliance System, Person Query Detail Record with an entry date of January 1, 2021. Suzuki Decl ¶ 33. For these two records, Exemption 3 is asserted on behalf of the Transportation Security Administration to protect Sensitive Security Information found in the responsive records. Suzuki Decl. ¶ 34. 49 U.S.C. § 114(r) prohibits the disclosure of Sensitive Security Information because of the detrimental effect it would have to the security of transportation if released. Sensitive Security Information is information obtained or developed in the conduct of security activities including research and development. 49 C.F.R. 1520.5(a)(3). Such information consists of security screening procedures, including selection criteria for the screening of persons as well as information and sources of information used by a passenger or property screening program or system, including an automated screening system, which is Sensitive Security Information and is therefore exempt from disclosure. 49 C.F.R. §1520.5(b)(9).

B. **USCIS**

USCIS withheld information per Section 222(f) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1202(f), which states in pertinent part:

> The records of the Department of State and of diplomatic and consular offices of the United States pertaining to the issuance or refusal of visas or permits to enter the United States shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States, except that - (1) in the discretion of the Secretary of State certified copies of such records may be made available to a court which certifies that the information contained in such records is needed by the court in the interest of the ends of justice in a case pending before the court.

16

INA Section 222(f) qualifies as a withholding statute under FOIA Exemption 3. "Under section 222(f) the Secretary of State has no authority to disclose material to the public. In that sense the confidentiality mandate is absolute; all matters covered by the statute 'shall be considered confidential.'" *Medina-Hincapie v. Dep't of State*, 700 F.2d 737, 741 (D.C. Cir. 1983). INA Section 222(f) applies not only to the information supplied by the applicant seeking to enter the United States, but also applies to any "information revealing the thought-processes of those who rule on the application." *Id.* at 744. USCIS has withheld information originating from the State Department that pertains to the issuance of a permit to enter the United States, which is exempt from disclosure under Exemption 3 pursuant to INA Section 222(f).

USCIS also located background and security documents that were provided to the Defense Counterintelligence and Security Agency for processing. That agency processed these documents which consisted of a "Report of Agency Adjudication Action on OPM Personnel Investigations" dated November 12, 2009, and a document entitled "U.S. Office of Personnel Management, Investigations Service" dated April 28, 2008. The Defense Counterintelligence and Security Agency asserted Exemption 3 to a portion of one page, on behalf of the Central Intelligence Agency, as justified in the declaration. Panter Decl. ¶¶ 49-50.

### III.   Exemption 5 – Deliberative Process Privilege

Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "The exemption incorporates the deliberative process privilege, which protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated.'" *Waterman v. IRS*, 61 F.4th 152, 156 (D.C. Cir. 2023) (quoting *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)) "To properly invoke Exemption 5, an agency must

show that withheld documents are 'both predecisional and deliberative.'" *Id.* (quoting *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 273 (2021)). A document is predecisional if it was "generated before the agency's final decision on the matter" and deliberative if it was "prepared to help the agency formulate its position." *Sierra Club*, 592 U.S. at 268.

The "ultimate purpose" of the deliberative process privilege is "to prevent injury to the quality of agency decisions." *Waterman*, 61 F.4th at 157 (quoting *Sears*, 421 U.S. at 151). It reflects the view that if agencies were "to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer." *Id.* (quoting *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1567 (D.C. Cir. 1987). The privilege also serves "to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Id.* (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

Lastly, once an agency demonstrates that the deliberative process applies, it must also show foreseeable harm. 5 U.S.C. § 552(a)(8)(A)(i)(I). "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369-70 (D.C. Cir. 2021). The agency must provide "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.* at 370.

### A.      CBP

CBP applied Exemption 5 to two records released to the Plaintiff on June 29, 2022. The Risk Assessment Worksheet dated May 27, 2019, and the January 4 and 5, 2021 internal email

discussions regarding Plaintiff's January 3, 2021, Dallas Fort Worth International Airport encounter. Suzuki Decl. ¶ 36-37. In this case, portions of documents were withheld that the Agency reasonably foresees would disclose the deliberative process protected under Exemption 5 and discourage employees from providing their candid opinions and recommendations to decisionmakers without fear of public disclosure. Suzuki Decl. ¶ 36.

As explained in greater detail in the declarations and supporting Vaughn indices, disclosure of these pre-decisional, deliberative documents will almost certainly have a chilling effect on future agency deliberations and fall squarely within the deliberative process privilege.

    **B.    USCIS**

USCIS applied the deliberative process privilege to portions of pages that include non-final determinations for third parties seeking immigration benefits and reflect the USCIS's employee's analysis, opinions, deliberations, and recommendation regarding the applicants' eligibility for immigration benefits. Panter Decl. ¶¶ 31-33. Given that information reflects the analysis, opinions, deliberations, and recommendations on non-final decisions, USCIS determined that releasing the information would chill or deter USCIS employees from engaging in the candid and frank discussions that are so important and necessary to the full and proper analysis and fair consideration of these immigration benefit requests on the merits. *Id.* For these reasons, the agency determined that release of the redacted information presented a foreseeable harm to the interests protected by the deliberative process privilege and FOIA Exemption 5. *Id.*

The redacted portions of pages also include deliberations regarding Plaintiff's EEO complaint. *Id.* The deliberations involved analysis, opinions, and deliberations prior to a final determination on the matter. *Id.* As discussed above, USCIS determined that releasing the information would chill or deter USCIS employees from engaging in the candid and frank discussions that are so important and necessary to the full and proper analysis and fair

consideration of this matter. *Id.* For these reasons, we determined that release of the redacted information presented a foreseeable harm to the interests protected by the deliberative process privilege and FOIA Exemption 5. *Id.* These redactions are further described in the attached *Vaughn* index.

Given that the information withheld includes non-final decisions and it reflects the analysis, opinions, deliberations, and recommendations, as discussed above, USCIS determined that releasing the information that was redacted would chill or deter USCIS employees from engaging in the candid and frank discussions that are so important and necessary to the full and proper analysis and fair consideration involved in determining immigration benefits. *Id.* For these reasons, we determined that release of the redacted information presented a foreseeable harm to the interests protected by the deliberative process privilege and FOIA Exemption 5. *Id.*

### C.   FBI

The FBI is withholding the two sets of the handwritten interview notes pursuant to the Exemption 5 and the deliberative process privilege because the FBI considers handwritten interview notes inherently deliberative and pre-decisional drafts used to prepare the FD-302. Seidel Decl. ¶¶ 59-65. The draft documents withheld here contain thoughts, ideas, impressions, and interpretations of the interview. *Id.* They contain information conveyed during the interview that the Special Agents determined should be noted for purposes of further analysis and consideration. *Id.* These thoughts, ideas, impressions, interpretations, and information are then fleshed out and distilled during the editorial process for the creation of the official Form FD-302 interview report, which reflects the FBI's final decision regarding the relevance of the impressions and information gleaned during the interview. *Id.* They may not reflect the entire scope of information covered during the interview as additional information may be added to the official Form FD-302 during the editing phase. *Id.* Likewise, there could also be information contained within the handwritten

interview notes that is not included in the official Form FD-302. *Id.* Information not appearing in the official Form FD-302 may be imperative to note at the time of the interview for purposes of later analysis and consideration but may not necessarily be placed in the official records (i.e., final Form FD-302) if the Special Agent ultimately concludes during the Form FD-302 editorial process that the information is not pertinent to the investigation. *Id.*

Special Agents rely heavily on individual assistance through interview, whether the person is an upstanding citizen or a criminal and must have the freedom to take notes freely and quickly without the fear of release to the public causing an opportunity to distort and/or misconstrue the words the Special Agent has penned. *Id.* Accordingly, release of the handwritten interview notes here would result in the following foreseeable harms: First, it would have a chilling effect on Special Agents' willingness to document their thoughts, impressions, interpretations, and in some instances, investigative strategies, which is imperative to their ability to prepare the official Form FD-302 interview report memorializing the interview. *Id.* Such a result would lead to Form FD-302 reports that are less comprehensive and thus less helpful to the FBI's investigative process. *Id.* Second, release of the handwritten interview notes would reveal Special Agents' internal deliberations and sorting of a multitude of ideas, and, at times, investigative strategies considered at the time of the interview, but later determined not relevant or ineffective. *Id.* Finally, release of the handwritten interview notes would also create public confusion as it will reveal information noted in the handwritten interview notes that SAs later determined was not necessary for inclusion in the final, official Form FD-302 interview report. *Id.* Additionally, the handwritten interview notes, because they are not finalized, are considered a draft document, and until finalized in the official records Form FD-302, can change as the document is being edited. *Id.* The handwritten

interview notes predate the final agency decisions and reflect the give and take of deliberations, through the editing process, which leads to final, refined products. *Id.*

The FBI found the two sets of draft handwritten interview notes here were shared intra-agency, were pre-decisional (predated the final product), were deliberative (the material was shared to solicit feedback or edits prior to finalizing the final Form FD-302), and release could potentially harm agency deliberations. *Id.* For these reasons, the FBI properly withheld deliberative records described here under Exemption 5, in conjunction with the deliberative process privilege. *Id.*

## IV.   **Exemption 5 – Attorney Client Privilege**

"The attorney-client privilege protects confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 26 (D.D.C. 2018) (cleaned up). "In the FOIA context, the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Id.* (citing *Jud. Watch, Inc. v. Dep't of Treasury*, 802 F. Supp. 2d 185, 200 (D.D.C. 2011)). "To be privileged, a communication must be 'for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding.'" *Id.* (citation and quotation omitted). "The purpose of the privilege is to ensure that a client's confidences are protected, encouraging clients to be honest with their attorneys." *Id.*

### A.   **CBP**

CBP invoked Exemption 5 to protect legal advice prepared by attorneys of CBP's Office of Chief Counsel, as well as descriptions of communications with counsel undertaken for the purpose of seeking or obtaining legal advice regarding the Risk Assessment Worksheet covering the recommendation submitted by the Risk Assessor, which reveals the Assessor's deliberative thought process, opinions, and preliminary recommendations. Suzuki Decl. ¶ 42. A release of the

exempt information on both the Risk Assessment Worksheet and e-mails would discourage both communications between personnel and CBP's Office of Chief Counsel regarding encounters, as well as inhibit CBP personnel from providing recommendations that are proposed during the deliberative process before final decisions are made. *Id.* A release of this information would prevent open and honest discussions between CBP employees and the expression of opinions that are not ultimately the basis for CBP decisions. *Id.*

### B.     USCIS

Here, portions of the documents contain recommendation and advice by USCIS attorneys and a Department of Justice attorney to USCIS staff members regarding non-final decisions on immigration benefits for third party applicants. Panter Decl. ¶¶ 34-37. The redactions also include information pertaining to information exchanged with an USCIS attorney and USCIS staff members regarding Plaintiff's EEO complaint. *Id.* These redacted portions constitute confidential communication between the USCIS attorneys and his or her client discussing the attorney's legal opinion and recommendation regarding immigration matters and Plaintiff's EEO complaint. *Id.* This information was reasonably provided in anticipation of further proceedings and potential litigation. *Id.* To compel the disclosure of this type of information would have an immediate impact and drastic chilling effect on all interactions between USCIS attorneys, a Department of Justice attorney and staff members as described in greater detail in the attached *Vaughn* index. *Id.*

### V.     <u>Exemption 7 – Law Enforcement Purpose</u>

"An agency whose 'principal function is law enforcement' is entitled to deference when it claims that records were compiled for law enforcement purposes." *Advancement Project*, 549 F. Supp. 3d at 143. To make the threshold showing, an agency "must establish that (1) a withheld record's creation was related to the enforcement of federal laws or to the maintenance of national security and (2) the nexus between the record's creation and the agency's law enforcement duties

is based on information sufficient to support at least a colorable claim of its rationality." *Id.* (citations omitted; internal quotation marks omitted). "Notably, a record may be compiled for law enforcement purposes even if it relates to guidelines, techniques, and procedures for law enforcement investigations and prosecutions outside of the context of a specific investigation." *Id.* (cleaned up) (quoting *Tax Analysts v. IRS*, 294 F.3d 71, 78 (D.C. Cir. 2002)).

Further, "an agency need not show that a document from which information is redacted under Exemption 7 was itself compiled for a law enforcement purpose." *New Orleans Workers' Ctr. for Racial Just. v. USCIS*, 373 F. Supp. 3d 16, 64 (D.D.C. 2019). "Exemption 7 applies to 'records *or information* compiled for law enforcement purposes,' and an agency may properly redact information from 'records [that] were not themselves compiled for law enforcement purposes' so long as the 'information [itself] was compiled for law enforcement purposes[.]'" *Id.* (citations omitted; emphasis in original).

Here, as detailed in the respective declaration all the relevant records were compiled for law enforcement purposes. *See* Suzuki Decl. ¶¶ 49, 56; Panter Decl. ¶¶ 41-42; Pineiro Decl. ¶¶ 50-55; Seidel Decl. ¶ 66.

## VI. <u>Exemption 7(C)</u>

Exemption 7(C) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "To meet its burden of establishing that Exemption 7(C) applies, the agency must demonstrate that (1) disclosure could 'reasonably be expected to constitute an unwarranted invasion of privacy' and (2) the 'personal privacy interest' is not 'outweighed by the public interest in disclosure.'" *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 18 F.4th 712, 718 (D.C. Cir. 2021) (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 160 (2004)). "Once the

agency shows that the 'privacy concerns addressed by Exemption 7(C) are present,' the party
seeking disclosure must show 'that the public interest sought to be advanced is a significant one,
an interest more specific than having the information for its own sake,' and that 'the information
is likely to advance that interest.'" *Id.* "If the asserted public interest is 'to show that responsible
officials acted negligently or otherwise improperly in the performance of their duties, the requester
must produce evidence that would warrant a belief by a reasonable person that the alleged
Government impropriety might have occurred.'" *Id.*

When information is claimed to be exempt from disclosure under both Exemption 6 and
7(C), courts "focus . . . on Exemption 7(C) because it provides broader privacy protection than
Exemption 6 and thus establishes a lower bar for withholding material." *Citizens for Resp. & Ethics
in Wash. v. Dep't of Just.*, 854 F.3d 675, 681 (D.C. Cir. 2017).

### A.      CBP

CBP applied FOIA Exemptions 6 and 7(C) to all records provided to the requester on June
29, 2023. Suzuki Decl. ¶ 40. Exemptions 6 and 7(C) were used to withhold names of CBP
personnel, telephone numbers, position identifiers, and unique alpha-numeric codes assigned to
individual CBP Officers who have performed actions documented in the records. *Id.* Additionally,
these exemptions were used to withhold names, dates of birth, identification numbers,
photographs, and citizenship information of third parties. *Id.*

CBP clearly compiled the identified records for law enforcement purposes. Suzuki Decl.
¶ 43. CBP's principal mission is to protect the borders, enforce federal immigration law, and
facilitate international trade and travel. The Global Enrollment System contains enforcement,
inspection, and intelligence records which allow the agency to gather, analyze, and utilize this
information to examine applicants for membership in the Global Entry program and assess,
monitor, and prevent risks at the border, allowing the agency to appropriately allocate resources

to travelers that are of unknown or higher risk. *Id.* Similarly, the Traveler Enforcement Compliance System contains enforcement, inspection, and intelligence records relevant to the anti-terrorism and law enforcement mission of CBP and numerous other federal agencies. *Id.* Additionally, the emails are records for law enforcement purposes, as they were created by CBP personnel and directly related to the Plaintiff and his Dallas-Fort Worth International Airport encounter with CBP personnel. *Id.* In these records, the disclosure of personally identifiable information for the third parties and CBP personnel would constitute an unwarranted invasion of privacy. Suzuki Decl. ¶ 44.

Moreover, the identification of an individual in association with the performance of their duties at a law enforcement agency creates a safety threat and risks unwarranted attribution and attention to the employee beyond the confines of his or her job and into his or her personal life. Suzuki Decl. ¶ 45. Disclosing a non-public facing CBP employee's name (and related information), absent a compelling public interest to do so, risks unnecessarily exposing that individual employee to potential safety threats. *Id.* Finally, the release of the identities of the CBP personnel and third parties in the responsive records would serve no public benefit or shed any light on the operations and activities of the agency, but instead would expose individual employees to potential harassment and an invasion of privacy. Suzuki Decl. ¶ 46. As such, the privacy interests of the third parties and CBP personnel identified in the responsive records outweigh any public interest in their release. *Id.*

### B.   USCIS

USCIS invoked Exemption 7(C) to protect personal information in law enforcement records, which could reasonably be expected to constitute an unwarranted invasion of personal privacy. Panter Decl. ¶¶ 43-45. This information pertains to information about third party individuals who did not provide consent for release. *Id.* This withheld information is on documents

compiled for law enforcement purposes. *Id.* The withheld information consists of biographical information pertaining to third party individuals, including names, addresses, dates of birth, and phone numbers. *Id.* This information is all personal information pertaining to these individuals. *Id.* Thus, there is a strong privacy interest in this material. *Id.* There is no public interest in this information as it does not in any way shed light on how the agency is performing its duties. *Id.* Therefore, USCIS determined that disclosure of this information would constitute an unwarranted invasion of personal privacy that is not outweighed by any public interest in the material. *Id.* Each invocation of Exemption 7(C) for third parties is described in greater detail in the attached *Vaughn* index.

USCIS also invoked Exemption 7(C) to protect personal information pertaining to DHS and USCIS employees assigned to law enforcement matters. *Id.* The release of these individuals personal identifying information could reasonably be expected to constitute an unwarranted invasion these employees' personal privacy. *Id.* The names, contact information and other personal information about these employees does not shed light on how the government is performing its mission as to the immigration laws. *Id.* Additionally, disclosure of this information could unnecessarily subject that individual to harassment or harm by individuals who disagree with DHS's mission or activities. *Id.* Thus, there is no public interest in this information that outweighs the privacy interests of these individuals. *Id.* Each invocation of Exemption 7(C) for USCIS employees is described in greater detail in the attached *Vaughn* index.

Additionally, USCIS referred documents to the Defense Counterintelligence and Security Agency, which asserted Exemptions 6 and 7(C) to portions of two pages. *Id.* ¶ 51. USCIS also referred documents to the Department of State, which asserted Exemptions 6 and 7(C) to portions of one page. *Id.* ¶ 52.

### C.    ICE

ICE applied Exemption 6 in conjunction with Exemption 7(C) to protect from disclosure the names, contact information, including domain names and email addresses, photographs, office numbers, initials, social security numbers, signatures, and other personally identifiable information of third-party individuals (including participants of these programs) and ICE employees. Pineiro Decl. ¶¶ 56-66 As can be seen from its declaration, ICE performed the requisite balancing test, and determined that the interests weighed in favor of not disclosing this information. *Id.*

### D.    FBI

The FBI asserted Exemptions 6 and 7(C) for four different categories of individuals. Seidel Decl. ¶¶ 67-78. First, they asserted the exemptions for the names and other identifying information of FBI Special Agents and support personnel. *Id.* Second, they asserted the exemptions for the name and other identifying information of a third party who provided information. *Id.* Third, the FBI asserted the exemptions for names and other identifying information of third parties merely mentioned. *Id.* Fourth, the FBI asserted the exemptions for the name and other identifying information of a third party of investigative interest. *Id.* For each category of information, the FBI performed the requisite balancing test and determined that the privacy interests outweighed the public interest, if any at all. *Id.*

## VII.   <u>Exemption 6</u>

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The exemption has been interpreted broadly to protect 'bits of personal information, such as names and addresses.'" *Pinson v. Dep't of Just.*, 313 F. Supp. 3d 88, 110 (D.D.C. 2018) (quoting *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015)). "The information in the file 'need not be intimate' for the file to satisfy the standard, and the threshold for determining whether information

applies to a particular individual is minimal." *Id.* (quotations omitted). "Private information must also implicate a 'significant privacy interest' to trigger protection." *Id.* "This standard, however, 'means less than it might seem,' as a significant interest is 'anything greater than a de minimis privacy interest.'" *Id.* "Something, even a modest privacy interest, outweighs nothing every time under the balancing test." *Id.* (cleaned up).

### A.   USCIS

Exemption 6 was invoked to withhold identifying information in records that related to third party individuals who did not provide consent for release. Panter Decl. ¶¶ 38-40. This withheld information is on immigration documents for individuals seeking immigration benefits. *Id.* The withheld information consists of the names and other personal information pertaining to these individuals. *Id.* There is a strong privacy interest in this material. *Id.* There is no public interest in this information as it does not in any way shed light on how the agency is performing its duties. *Id.* Therefore, USCIS determined that disclosure of this information would constitute a clearly unwarranted invasion of personal privacy that is not outweighed by any public interest in the material. *Id.* Each invocation of Exemption 6 is described in greater detail in the attached *Vaughn* index. *Id.*

Exemption 6 was also invoked to redact identifying information of USCIS staff members including their names in certain instances, telephone numbers, and email addresses. *Id.* There is a privacy interest in protecting this information as these individuals could be subject to harassment and intimidation by the public. *Id.* Plaintiff did not provide consent for release or a public interest, as defined by FOIA, which to balance the individuals' privacy interests. *Id.* Thus, disclosure would constitute a clearly unwarranted invasion of personal privacy. *Id.*

29

**B.     CBP, USCIS, ICE, and FBI**

To the extent that any documents where the agencies asserted both Exemptions 6 and 7(C) do not serve a law enforcement purpose, they also fall under Exemption 6.

**VIII.   <u>Exemption 7(E)</u>**

Exemption 7(E) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E).

"The D.C. Circuit has 'set a relatively low bar for the agency to justify withholding.'" *Pinson*, 313 F. Supp. 3d at 117 (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)). "Such information may be withheld 'not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.'" *Id.* (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)). "Moreover, the first clause of Exemption 7(E) affords categorical protection for techniques and procedures used in law enforcement investigations or prosecutions, whereas the second clause separately protects guidelines for law enforcement investigations or prosecutions if their disclosure could reasonably be expected to risk circumvention of the law." *Id.* (cleaned up) "Furthermore, the government 'must show that the records contain law-enforcement techniques and procedures that are generally unknown to the public." *Id.* (cleaned up). And like the other exemptions, "[t]he proper assertion

of 7(E) goes a long way to show the risk of foreseeable harm from disclosure." *Kendrick*, 2022 WL 4534627, at *10.

### A.    CBP

In each record provided to the Plaintiff on June 29, 2022, CBP applied FOIA Exemption 7(E) to withhold law enforcement database queries and results, file names, codes, law enforcement related discussions, and different analyses performed by the agency when evaluating the Plaintiff for entry into the country and membership in the Global Entry program. Suzuki Decl. ¶ 47. Additionally, the information withheld from certain records consists of law enforcement techniques or procedures utilized by CBP Officers as they evaluate applicants for membership in a trusted traveler program. Suzuki Decl. ¶ 50.

Bad actors armed with this information could circumvent the law and frustrate CBP's law enforcement efforts. Suzuki Decl. ¶ 52. If released, applicants and members could attempt to conceal any derogatory information on their record and fraudulently gain access to a trusted traveler program and potentially receive reduced scrutiny during inspections at the border. *Id.* Releasing this information could further allow individuals previously unaware of law enforcement activity related to their actions to alter their patterns of conduct, adopt new methods of operation, or effectuate other countermeasures, all of which could frustrate CBP's ability to investigate potential violations of law. *Id.*

If this information is unprotected, trusted traveler program applicants and members could alter their behavior or manipulate their applications to thwart CBP efforts to secure the border and effectively make eligibility determinations per 8 C.F.R. § 235.12 and could facilitate the acceptance of high-risk travelers into CBP's trusted traveler programs. Suzuki Decl. ¶ 53. The acceptance of high-risk travelers into trusted traveler programs would create serious security risks at our nation's borders. *Id.* Travelers who would otherwise be more likely to undergo enhanced

inspection could take advantage of the privileges conferred to trusted traveler program members, including expedited processing and entry at ports of entry. *Id.* This could hinder CBP's efforts to interdict potentially dangerous travelers. *Id.*

Moreover, the release of this information could allow technologically advanced individuals to access and navigate the agency's law enforcement databases and alter, add, or delete information contained therein. Suzuki Decl. ¶ 56. This information could enable electronic trespassers to manipulate or delete database information, facilitate navigation or movement through the system, compromise the electronic records system, facilitate improper access to sensitive investigatory and other law enforcement records, impede effectiveness of law enforcement activities, and endanger agency investigatory practices and techniques. *Id.*

Finally, the disclosure of the codes used in certain data fields in the applicable government systems would reveal not only information unique to those particular inspections, but also how that information is communicated between officers. Suzuki Decl. ¶ 61. Information about such "red flags," if unprotected, could enable individuals to thwart efforts to secure the border and enforce immigration and customs laws. *Id.* Disclosure of this shorthand communication would serve no legitimate public interest, as its meaning would be irretrievably distorted once taken from the tightly controlled context in which it is created, interpreted, and shared solely by and between law enforcement personnel. *Id.*

The declaration of CBP, combined with their detailed *Vaughn* index, amply demonstrate that the responsive records contain non-public information about techniques, procedures, or guidelines for law enforcement investigations, including law enforcement database queries and results, file names, codes, law enforcement related discussions, and different analyses performed by the Agency when evaluating the Plaintiff for entry into the country and membership in the

Global Entry program. Disclosure of the information will make procedures the Government has right to maintain in secrecy public and will make it more difficult for them to pursue their law enforcement missions. Accordingly, summary judgment is appropriate as to Exemption 7(E).

**B.      USCIS**

USCIS withheld portions of documents pursuant to Exemption 7(E) that contain law enforcement information which would disclose techniques and procedures for law enforcement investigations where such disclosure could reasonably be expected to risk circumvention of the law. Panter Decl. ¶¶ 46-50. The types of documents and/or information withheld includes law enforcement systems checks, and law enforcement database codes, sources of information and portions of a document containing security policy. *Id.* Portions of this information, which points to or contains information about systems that law enforcement use to store, index, and communicate information, could be used by persons seeking improper access to law enforcement sensitive data to navigate these databases and compromise the integrity of the data either by deleting or altering information. *Id.* The release of this information could also reasonably be expected to allow a person to breach sensitive legal/ law enforcement sensitive systems and potentially circumvent detection or manipulate law enforcement sensitive information, in an attempt to sabotage DHS operational activities. *Id.* The disclosure of this information, which is not readily known by the public, would serve no public benefit and would not assist the public in understanding how the agency is executing its statutory responsibilities.

As to Exemption 7(E), USCIS determined that disclosure of law-enforcement techniques, procedures and guidelines would reveal information about the Agency's enforcement of immigration and national security laws and directives and could reasonably be expected to risk the circumvention of law. *Id.* Depending on the specific information at issue, and as identified and further explained in the attached *Vaughn* index, release of this information could reasonably be

expected to allow individuals to circumvent detection, identify patterns or trends by USCIS or other law-enforcement staff, breach sensitive systems or databases and/or interfere with USCIS. *Id.* For the reasons explained herein and within the attached *Vaughn* index, USCIS determined that release of the redacted information could reasonably be expected to risk circumvention of the law and therefore presented a foreseeable harm to the interests protected by Exemption (b)(7)(E). *Id.*

### C.   ICE

ICE has applied Exemption 7(E) to law enforcement sensitive information, specifically disclosure to law enforcement codes and ICE-specific intranet URLs. Pineiro Decl. ¶¶ 67-68. ICE determined that the disclosure of the techniques and procedures could assist third parties in circumventing the law and avoid detection by providing them a blueprint of what law enforcement officers use to take enforcement steps and ensure the security of its facilities. *Id.* Documents containing detailed law enforcement sensitive information, such as actions or decisions performed by an officer in determining risk classification status could assist those people seeking to violate or circumvent the law by taking proactive steps to counter operational and investigative actions taken by ICE during enforcement operations. *Id.* The disclosure of the law enforcement sensitive information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory duties. *Id.*

### D.   FBI

The FBI applied Exemption 7(E) to six categories of records. Seidel Decl. ¶¶ 79-93. First, the FBI applied the exemption to sensitive file numbers. *Id.* Second, the FBI applied the exemption to the identity of FBI division. *Id.* Third, the FBI applied the exemption to internal FBI phone numbers, intranet addresses, and data hash. *Id.* Fourth, the FBI applied the exemption to a specific FBI investigation. *Id.* Fifth, the FBI applied the exemption to polygraphs. *Id.* Sixth, the FBI also withheld records under Exemption 7(E) that was referred to it by USCIS. These were National

Name Check Program records. *Id.* For every category, the FBI explained how disclosing the records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E).

## IX.    The Agencies Adequately Segregated All Reasonably Segregable Information

"An agency shall . . . consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii). "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Non-exempt portions of a document must be disclosed unless they are "inextricably intertwined" with exempt portions. *Sussman v. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (quoting *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)). Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material. *Lewis v. Dep't of Treasury*, 851 F. App'x 214, 217 (D.C. Cir. 2021); *Sussman*, 494 F.3d at 1117.

Each agency examined the records to determine whether any segregable information could be produced. *See* Suzuki Decl. ¶ 70; Panter Decl. ¶ 56; Pineiro Decl. ¶¶ 69-71; Seidel Decl. ¶¶ 95-98. These assertions are entitled to a presumption of compliance. *Lewis*, 851 F. App'x at 217; *Sussman*, 494 F.3d at 1117.

## X.    The FBI's Glomar Response

A *Glomar* response is "proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Dalal v. Dep't of Just.*, Civ. A. No. CV 16-1040 (TJK), 2022 WL

17092863, at *22 (D.D.C. Nov. 21, 2022). "As the D.C. Circuit put it, an agency 'may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception.'" *Id.* (citation omitted). "To determine whether a *Glomar* response 'fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases.'" *Id.* "An agency issuing a *Glomar* response must explain in as much detail as possible why it cannot confirm or deny the existence of certain records or categories of records, which it may seek to do by affidavit." *Id.* "If a *Glomar* response is justified, 'the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents.'" *Id.*

Here, the FBI asserted a Glomar response for four categories of information. *See* Second Seidel Decl., ECF No. 31-7 at 106-23 . First, the FBI asserted a *Glomar* response for national security or foreign intelligence records pursuant to Exemptions 1 and Exemption 3, in conjunction with 50 U.S.C. § 3024(i)(1). *Id.* Second, the FBI asserted a *Glomar* response for records that would identify any individual in the Witness Security Program pursuant to FOIA Exemption 3 and 18 U.S.C. § 3521. *Id.* Third, the FBI asserted a *Glomar* response for records that would identify any individual on a watchlist pursuant to FOIA Exemption 7(E). *Id.* Fourth, the FBI asserted a *Glomar* response for records, the release of which could reasonably be expected to endanger the life or physical safety of a confidential human source (CHS) pursuant to FOIA Exemptions 7(D), 7(E), and 7(F). *Id.* According to the second Steidel declaration, the Court can see that the FBI easily satisfied the *Glomar* requirements. *Id.*

\*      \*      \*

36

**CONCLUSION**

For the reasons above, the Court should grant summary judgment to Defendants.


Date:   March 6, 2024                          Respectfully submitted,
        Washington, DC

                                               MATTHEW M. GRAVES, D.C. Bar # 481052
                                               United States Attorney

                                               BRIAN P. HUDAK
                                               Chief, Civil Division

                                               By:   _____/s/ Sam Escher_____
                                                     SAM ESCHER, D.C. Bar # 1655538
                                                     Assistant United States Attorney
                                                     601 D Street, N.W.
                                                     Washington, D.C. 20530
                                                     (202) 252-2531
                                                     Sam.Escher@usdoj.gov

                                               *Attorneys for the United States of America*

37