UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ADAM MALIK,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, et al.,<br><br>　　　　Defendants. | Civil Action No. 22-0698 (CRC) |

## DECLARATION OF SHARI SUZUKI

I, Shari Suzuki, declare as follows:

1.　　I am the Freedom of Information Act ("FOIA") Appeals Officer, and Chief of the FOIA Appeals and Policy Branch ("FAB"), Regulations and Rulings ("RR"), Office of Trade ("OT"), U.S. Customs and Border Protection ("CBP"), U.S. Department of Homeland Security ("DHS"). Since April 2, 2006, I have been the official charged with the following responsibilities: (1) giving guidance and instruction to CBP personnel regarding processing FOIA requests; (2) adjudicating administrative appeals that concern FOIA requests; and (3) overseeing CBP activities related to information disclosure under FOIA.

2.　　I am familiar with Adam Malik's (hereinafter "Plaintiff") requests and subsequent appeals for information from CBP pursuant to the FOIA. All information contained herein is based upon information furnished to me in my official capacities of FAB Branch Chief. The statements I make in this declaration are based on my personal knowledge, which includes knowledge acquired through, and agency files reviewed in, the course of my official duties.

3.     The purpose of this Declaration is to describe CBP's handling of the Plaintiff's FOIA requests and appeals and to provide a *Vaughn* Index identifying information responsive to the Plaintiff's FOIA requests and appeals, but exempt from disclosure under the FOIA, in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974).  Attached hereto as Exhibit A is a true and correct copy of the *Vaughn* Index identifying the documents released to the Plaintiff under the FOIA and the statutory bases under the FOIA for the redaction of certain information from the records released to the Plaintiff.  This Declaration, along with the *Vaughn* Index, provides an identification of information that is withheld, the statutory exemption(s) claimed, and the justification for asserting the exemptions used to withhold certain information contained in the records at issue.

4.     This Declaration consists of: (i) a summary of the relevant facts and correspondence regarding the Plaintiff's FOIA requests and appeals; (ii) a description of the searches for responsive records; and (iii) the justification of the use of FOIA exemptions.

## I.     SUMMARY OF RELEVANT FACTS AND CORRESPONDENCE CONCERNING PLAINTIFF'S FOIA REQUESTS AND APPEALS

### A.     Plaintiff's First FOIA Request and Appeal:

5.     Plaintiff made its initial FOIA Request (CBP-2021-022255) to CBP through FOIAOnline dated January 7, 2021, which requested from CBP:

1.     All information pertaining to the seizure of my iphone at DFW airport on January 3, 2021.

2.     All information [sic] pertaining to the use and handling of my iphone.

3.     All the information pertaining to the use and handling of the information obtained from and/or through my iphone.

4.     The information obtained from and/or through my iphone.

5.     All information [sic] regarding the destruction of information obtained from and/or through my iphone.

6.      All information pertaining to the Filter Team's review of information obtained from and/or through my iphone.

7.      All information pertaining to CBP's coordination of the review of the above information with the US Attorney's Office.

8.      All information pertaining to the revocation of my Global Entry.

9.      All information pertaining to my selection for secondary inspection at the DFW airport on January 3, 2021.

10.     All emails pertaining to me since December 20, 2020.

6.      On February 9, 2021, in response to Plaintiff's initial FOIA request, CBP's FOIA Division released 15 pages of records responsive to the request. These records included an Electronic Media Report dated 01/03/2021; Incident Log Report dated 01/03/2021; Secondary Inspection Report dated 01/03/2021; three-page E-mail chain dated 01/04/2021; and Form 6051-D, Detention Notice and Custody Report for Detained Property, dated 01/03/2021. Additionally, FOIA Division withheld in full, one five-page email discussion between representatives of CBP's Office of Field Operations and Office of Chief Counsel.

7.      Via a FOIAOnline submission dated March 22, 2021, Plaintiff appealed (CBP-AP-2021-045009) the FOIA Division's February 9, 2021 response. Within the appeal, Plaintiff claimed that:

> the response fails to include: (a) information or documentation about the chain-of-custody and handling of the iPhone (see CBP Form 6051D, Item "21"), and (b) communications, including e-mails, texts, etc., pertaining to Adam Malik. The government has not stated or shown in its response that its search performed was adequate, or reasonably calculated to uncover all relevant documents, or any explanation of how the search for records was done and the form and location of the files searched. Additionally, insufficient, or no, information was provided to assess the applicability of the several FOIA exceptions stated and relied upon in the FOIA response. For example, as stated in the FOIA response, "[o]ne document is withheld in full" pursuant to no fewer than four statutory exceptions, but CBP has provided absolutely no information in its response to assess the applicability of the exceptions cited. CBP has not even provided any name for the document or so much as a brief description of it.

8.    An attorney on my staff reviewed the appeal and concluded FOIA Division's initial search was adequate and sufficient regarding Items 1-7 and 10 of the initial request (see paragraph 5 above), but that the FOIA Division did not address Item 8 and certain searches were omitted that were necessary to address Item 9.

9.    On September 20, 2021, an attorney on my staff performed searches for records responsive to Item 8 of the initial request. He located responsive records, including one six-page Global Enrollment System ("GES") Summary, one three-page Risk Assessment Worksheet dated July 28, 2014, and one five-page Risk Assessment Worksheet dated July 22, 2019. Following this, on March 10, 2022, additional searches for records responsive to Item 9 of the initial request were performed. Two more records: one Secondary Inspection report, and one Person Query record, both dated January 3, 2021 were located. Additionally, a five-page email thread dated January 4 and 5, 2021 which was initially withheld in full in the initial response (as stated in Paragraph 6), a three-page email dated January 4, 2021, and a six-page email dated January 4, 2021 were also provided in this litigation in response to Item 10 of the initial request. All of the records discussed in this paragraph were redacted in part (as explained in the *Vaughn* Index) and provided to the Plaintiff on June 29, 2022.  Additionally, the Electronic Media Report dated 01/03/2021, Incident Log Report dated 01/03/2021, and other Secondary Inspection Report dated 01/03/2021 records, as listed in paragraph 6 above, were also re-released to the Plaintiff on June 29, 2022.

   **B.    Plaintiff's Second FOIA Request and Appeal (two):**

10.    On March 22, 2021, Plaintiff submitted another FOIA Request through the FOIAOnline platform (CBP-2021-044851). The Plaintiff requested:

> "[a] copy of the video(s) from all cameras located at the DFW airport's CBP secured area from January 03, 2021, that show Officer Brock Allen and Supervisory Officer Aaron Sullivan escorting the subject (Adam Malik, ████/1977) from the secondary inspection area on the second floor to the exit on the first floor, where

Supervisory Officer Aaron Sullivan became aggressive and assaulted Mr. Adam Malik from behind."

11.    The FOIA Division completed a search for the video records and on April 6, 2021, closed the request as they could not locate any records.

12.    Following receipt, on April 7, 2021, Plaintiff filed an appeal to this response (CBP-AP-2021-050308). The appeal states:

> "CBP's FOIA response states in its entirety, "No Records." This appeal is made of CBP's cursory FOIA response because the government has not stated or shown in its response that its search performed was adequate, or reasonably calculated to uncover all relevant material or records, or any explanation of how the search for responsive material or records was done and the form and location of the files searched. See, e.g., American Immigr. Council v. DHS, 905 F.Supp.2d 206, 215 (D.D.C. 2012) (search not adequate where agency failed to state what kinds of records the offices keep, which records or databases the offices searched through, or how the offices conducted their searches)."

13.    An attorney on my staff reviewed the initial response from FOIA Division and determined the initial search was not adequate. The attorney then contacted the Dallas Fort Worth Office of Field Operations ("DFWOFO") for video records. DFWOFO reported that they could not identify records, highlighting that video records are retained for only 90 days. Following this information, on May 20, 2021, the attorney responded to the Plaintiff and closed the appeal with a "No Records" determination.

14.    On May 25, 2021, Plaintiff submitted an appeal to the CBP-AP-2021-050308 appeal response. In this improper appeal, the Plaintiff stated the response:

> "fail[ed] to include:
>
> 1.    Information or document(s) that references the protocol or the rule regarding the keeping of the video records at the CBP secure locations inside the airports in general and DFW airport terminal D (Immigration and Customs inspection area) specifically.
>
> 2.    Information or document(s) that names the agency or entity, other than CBP, that may have a copy of the camera recordings subject to this FOIA request.

3.     The Standard Operating Procedures (SOP) on how the video records are kept, handled, held, retained, transferred, entrusted, or saved by/with a separate/different agency/entity, specifically for CBP DFW airport. Or what happens to the video recordings at the DFW airport terminal D (Immigration and Customs inspection area) when they are no longer "retained."

4.     Information or document(s) that name(s) of the agency/office/ department/ individual/ entity that may have a copy of the video that is subject of this foia, or the name(s) of the agency/office/department/individual/entity that is the custodian of the records that includes the video that is subject of this foia."

15.    On June 8, 2021, this appeal was closed because the Plaintiff requested records not previously sought in the initial request and appeal above, and that this appeal did not follow the proper appellate process.

       **C.    Plaintiff's Third FOIA Request and Appeal:**

16.    On June 8, 2021, Plaintiff submitted another FOIA Request (CBP-2021-071560) through the FOIAOnline platform. The Plaintiff requested similar information to what he listed in the improper appeal of CBP-AP-2021-050308:

"1.     Information or document(s) that references the protocol or the rule regarding the keeping of the video records at the CBP secure locations inside the airports in general and DFW airport terminal D (Immigration and Customs inspection area) specifically.

2.     Information or document(s) that names the agency or entity, other than CBP, that may have a copy of the camera recordings from DFW airport's CBP secured area terminal D from January 03, 2021, approximately around 21:17 CST.

3.     The Standard Operating Procedures (SOP) on how the video records are kept, handled, held, retained, transferred, entrusted, or saved by/with a separate/different agency/entity, specifically for CBP DFW airport.  Or what happens to the video recordings at the DFW airport's CBP secured area terminal D from January 03, 2021, approximately around 21:17 CST (Immigration and Customs inspection area) when they are no longer "retained."

4.     Information or document(s) that name(s) of the agency/office/ department/ individual/ entity that may have a copy of the video that is subject of this foia, or the name(s) of the agency/office/department/individual/entity that

> is the custodian of the records that includes the video from DFW airport's
> CBP secured area terminal D from January 03, 2021, approximately around
> 21:17 CST."

17.    Following the request, the FOIA Division contacted DFWOFO who reaffirmed that the

video footage is only saved for 90 days, provided the camera is being utilized at the time.

Additionally, FOIA Division was provided two separate CBP Handbooks, but withheld them in

full under Title 5 U.S.C. § 552 (b)(7)(E). On July 1, 2021, the FOIA Division closed this request

with an "Improper FOIA Request for Other Reasons" determination.

18.    Following this, on August 2, 2021, the Plaintiff appealed this decision via FOIAOnline

(CBP-AP-2021-090305) and stated:

> "The CBP responses based on FOIA requests CBP-2021-071560 and CBP-2021-
> 044851 are provided in bad faith. They are simply an attempt to cover up a crime
> by a CBP officer. No exemptions and privilege can be applied in good faith when
> it is to undermine the protections of the laws of the United States and the US
> Constitution. No one is above the law, not even the CBP or a CBP officer who
> commits a crime under the color of the authority."

19.    Upon receipt of this appeal, an attorney on my staff reviewed the FOIA Division

determination and after discussion, on August 31, 2021, closed the appeal as the requested

information was part of a pending litigation.

### D.    Plaintiff's Fourth FOIA Request:

20.    On February 8, 2022, the Plaintiff submitted another FOIA Request (CBP-2022-041139)

through the FOIAOnline platform seeking:

> "Subject of this FOIA request is Adam Malik (DOB █████/1977).
>
> 1.    Copies of all applications made by the subject for Global Entry
>       Applications.
>
> 2.    Any information, documents, records related to the subject's Global Entry
>       Applications.
>
> 3.    Any notes or records created by CBP employees or contractors related to
>       the Global Entry account or membership.

4.      Any and all information, data, records, notes, documents, logs that were considered AND became the basis the revocation of the subject's Global Entry membership.

5.      Copy of the report or log that was created by Supervisory CBP Officer Aaron Sullivan out of DFW airport that was also considered as the basis of the revocation for the subject's Global entry."

21.    The Plaintiff also requested expedited processing for this case, which the FOIA Division denied. As for the request, on May 10, 2022, the FOIA Division closed the request due to this litigation. There was no appeal for these records.

22.    The information requested in this case (CBP-2022-041139) which was within the custody and control of CBP was provided to the Plaintiff on June 29, 2022. See the *Vaughn* Index for an explanation of the records and its use of proper exemptions.

## II.    THE SEARCHES FOR RESPONSIVE RECORDS WAS ADEQUATE AND REASONABLE

23.    In response to these requests and appeals, multiple attorneys on my staff searched for records through the TECS and Global Enrollment System platforms using the name and date of birth provided by the requester, and contacted the appropriate offices, as mentioned above.

24.    TECS is an overarching law enforcement information collection, analysis, and sharing environment that securely links telecommunications devices and personal computers to a central system and database.  This environment is comprised of several modules designed to collect, maintain, and screen data as well as conduct analysis, screening, and information sharing. Additional information regarding what the TECS system of records contains is available in the TECS system of records notice (SORN) at 73 Fed. Reg. 77778 (December 19, 2008). TECS includes border crossing information on travelers entering and departing the United States. Additional information regarding border crossing information is available at 81 Fed. Reg. 89957 (December 13, 2016).

25.    The GES is an official system of records for CBP's trusted traveler programs that facilitates enrollment and continued membership in such programs. GES contains trusted traveler program applicants' and members' enrollment data, including biographic and biometric information collected during the application and enrollment process, as well as the vetting results based on information obtained from various law enforcement databases. It also contains information on CBP's determinations regarding acceptance into, and continued membership in, the various CBP trusted traveler programs.

26.    In addition to searches of TECS and GES, the CBP FOIA personnel had contacted the appropriate offices where video records and other records could likely be found: DFWOFO. DFWOFO was determined to be the office in which responsive records, if any, were likely to have been created and be maintained because of their participation in the January 3, 2021 interaction.

27.    CBP's Office of Field Operations ("OFO") is the largest component within CBP, and that component is responsible for securing the U.S. border and preventing terrorists and terrorist weapons from entering the United States at its ports of entry.  OFO manages core CBP programs and operations at 20 Field Operations offices; 328 ports of entry; 16 preclearance stations in Canada, Ireland, the UAE, and the Caribbean. OFO has primary operational responsibility for trade and passenger facilitation, interdiction, and enforcement programs.  It was because of the nexus between the information requested regarding the Plaintiff's interaction with the DFWOFO that me or the CBP FOIA personnel contacted DWFOFO and asked that the office search for responsive records.

28.    Beyond the attorneys on my staff locating records which were provided to the Plaintiff on June 29, 2022, DFWOFO identified and provided two of its policies/manuals, "CBP Security Policy and Procedures Handbook" and "Airport Technical Design Standard November 2017" that

are responsive to the Plaintiff's FOIA requests and appeals (CBP-2021-071560; CBP-AP-2021-090305). After review, we provided these two documents in full to the Plaintiff on January 9, 2023.

29.    An attorney on my staff provided all the records (albeit, some redacted) we could locate based on the multiple requests and appeals submitted by the Plaintiff.

### III.    JUSTIFICATION OF USE OF FOIA EXEMPTIONS

30.    CBP did not withhold any record in full. However, for the records provided with redactions, the withheld information was redac ted under exemptions 5 U.S.C.§ 552 (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). The *Vaughn* Index attached to this declaration provides a detailed explanation for why each exemption was applied in each document.

#### A.    5 U.S.C. § 552(b)(3)

31.    Exemption (b)(3) applies to information that is specifically exempted from disclosure by statute if that statute either requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue or establishes criteria for withholding or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3).

32.    CBP applied exemption (b)(3) on two separate records released to the Plaintiff on June 29, 2022. The first record is the Risk Assessment Worksheet ("RAW") record dated July 28, 2014. The second record is the TECS Person Query Detail Record with an entry date of January 1, 2021.

33.    In these two records, FOIA Exemption (b)(3) is asserted on behalf of the Transportation Security Administration ("TSA") to protect Sensitive Security Information ("SSI") found in the responsive records. 49 U.S.C. §114(r) prohibits the disclosure of information that would be detrimental to the security of transportation if released. TSA regulations implementing Section 114(r) are found in 49 C.F.R. Part 1520.

34.    Pursuant to 49 C.F.R. §1520.5(b)(9), security screening procedures, including selection criteria for the screening of persons as well as information and sources of information used by a

passenger or property screening program or system, including an automated screening system, is

SSI and is therefore exempt from disclosure.

35.     Although the FOIA Improvement Act of 2016 specified that no foreseeable harm analysis

is required when disclosure is prohibited by law, such as when records are protected by a statute

other than the FOIA, I note there is clear harm in release of the information as it would specifically

reveal whether or not Plaintiff is subject to specific security screening procedures.

      **B.     5 U.S.C. § 552(b)(5) Deliberative Process; Attorney-Client Privilege**

36.     CBP applied FOIA Exemption (b)(5) to two records we released to the Plaintiff on June

29, 2022. The Risk Assessment Worksheet dated May 27, 2019, and the January 4 and 5, 2021

internal email discussions regarding Plaintiffs January 3, 2021 Dallas Fort Worth International

Airport encounter.

37.     Exemption (b)(5) exempts from disclosure matters that are "inter-agency and intra-agency

memorandums or letters which would not be available by law to a party other than an agency in

litigation with the agency."  In this case, portions of documents were withheld that the agency

reasonably foresees would disclose the deliberative process protected under exemption (b)(5) and

discourage employees from providing their candid opinions and recommendations to

decisionmakers without fear of public disclosure.

38.     The purpose of the deliberative privilege is (1) to encourage open, frank discussions on

matters of policy between subordinates and superiors; (2) to protect against premature disclosure

of proposed policies before they are actually adopted; and (3) to protect against public confusion

that might result from the disclosure of reasons and rationales that were not in fact ultimately the

grounds for an agency's action.  The privilege protects the decision-making processes of the

government agencies and the integrity of the deliberative process itself where exposure of that

process would result in harm.

39.    Exemption (b)(5) has been applied to the Risk Assessment Worksheet covering the recommendation submitted by the Risk Assessor, which reveals the Assessor's deliberative thought process, opinions, and preliminary recommendations.

40.    There is a foreseeable harm under Exemption 5 regarding the Risk Assessment Worksheet as the information withheld is predecisional and discusses how the CBP investigation process is handled as it relates to status recommendations for individuals in their Global Entry applications. This information is deliberative and predecisional because it shows the chain of decision discussions and how they are revised or approved (each application is different). Disclosing these details would show draft decisions and opinions that CBP may or may not have adopted and would provide information and internal collaborations that could be used for applicants to avoid providing in future applications.

41.    There is foreseeable harm in releasing the Risk Assessment Worksheet because the information reveals how a single employee made a recommendation on a Global Entry application and how that recommendation was handled as it progressed up through a chain of command.  Not all recommendations are adopted.  In fact, some recommendations are adopted on different grounds, and some recommendations are rejected. Employees will hesitate in making recommendations if they know their preliminary recommendations will be released, scrutinized, and second-guessed.  Even employees higher up in the decision chain will hesitate in agreeing or disagreeing with recommendations knowing their thought processes will be revealed.  It is crucial that employees involved in this type of decision-making share their views and concerns freely with their colleagues.  Such freedom is imperative in ensuring better quality of decisions. The Risk Assessment Worksheet reflects discussions as the decision moved up the chain of command and reveals how recommendations are revised and approved or rejected. Additionally, revealing details

regarding the recommendations, opinions and how the final decision was made will provide information on internal collaborations and could be used by applicants to manipulate information to make applications more favorable thus tainting the application process.

42.    Additionally, Exemption (b)(5) protects from disclosure information that is protected under the Attorney-Client Privilege.    The Attorney-Client Privilege protects confidential communications between an attorney and his client relating to a legal matter for which the client has sought advice.  The attorney-client privilege is not limited to the context of litigation.  The attorney-client privilege applies to facts divulged by a client to his attorney, opinions given by an attorney to his client based upon and reflecting those facts. The purpose of the attorney-client privilege is to ensure that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client. Here, exemption (b)(5) been applied to specific emails between CBP Office of Chief Counsel and CBP employees at Dallas-Fort Worth Airport regarding the January 3, 2021 encounter. These emails involve an attorney supplying legal advice to their client by answering questions, providing responses, and having discussions.

43.    A release of the (b)(5) exempt information on the emails would discourage both communications between personnel and chief counsel regarding encounters, as well as inhibit CBP personnel from providing recommendations that are proposed during the deliberative process before final decisions are made. A release of this information would prevent open and honest discussions between CBP employees and the expression of opinions that are not ultimately the basis for CBP decisions.

44.    The foreseeable harm in these email records is high as a release would allow the Plaintiff to involve himself in CBP national security investigation discussions. Releasing the attorney email

communications would force attorneys to limit and eliminate discussions about how to handle national security investigations and/or what to look for during these investigations. Due to this, it is clear if the attorney discussions related to the investigations are released to the Plaintiff or any bad actor, the foreseeable harm to the agency and the public would be outstanding, as the bad actors would have an opportunity to prepare to or be able to evade CBP investigations. Additionally, preventing the attorneys from having investigatory communications without fear of release would cause irreparable harm to the national security due to CBP's position as a national security agency.

45.    Release of the attorney-client emails would cause foreseeable harm because it would make clients hesitate to provide full, open, and honest information to their attorney which is critical in any attorney-client relationship and especially in conversations related to national security investigations.  It would also make attorneys less like to discuss and provide confidential opinions and advice via email.  Release of these attorney-client email discussions would also reveal substantive information on how CBP handles national security investigations which would provide bad actors with more insight into CBP procedures which would allow them to better prepare or evade CBP detection and investigations.

**C.    5 U.S.C. § 552(b)(6) and 5 U.S.C. § 552(b)(7)(C): Personally Identifiable Information ("PII")**

46.    CBP applied FOIA Exemptions (b)(6) and (b)(7)(C) to all records provided to the requester on June 29, 2023. Exemptions (b)(6) and (b)(7)(C) were used to withhold names of CBP personnel, telephone numbers, position identifiers, and unique alpha-numeric codes assigned to individual CBP Officers who have performed actions documented in the records. Additionally, these exemptions were used to withhold names, dates of birth, identification numbers, photographs, and citizenship information of third parties.

47.    Exemption (b)(6) protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The range of documents falling within these categories is interpreted broadly to include all government information which can be identified as applying to that individual. The responsive records here qualify as "similar" records and the exemption's protections extend to the individuals identified therein.

48.    Exemption (b)(7)(C) excludes records or information compiled for law enforcement purposes, to the extent that the production of such materials "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption (b)(7)(C) is designed to protect, among other things, law enforcement personnel from harassment and annoyance in the conduct of their official duties and in their private lives, which could conceivably result from the public disclosure of their identity. Exemption (b)(7)(C) is also intended to protect third parties whose identities are revealed in law enforcement files from comment, speculation, and stigmatizing connotation associated with being identified in a law enforcement record.

49.    CBP clearly compiled the identified records for law enforcement purposes. CBP's principal mission is to protect the borders, enforce federal immigration law, and facilitate international trade and travel. GES contains enforcement, inspection, and intelligence records which allow the agency to gather, analyze, and utilize this information to examine applicants for membership in the Global Entry program and assess, monitor, and prevent risks at the border, allowing the agency to appropriately allocate resources to travelers that are of unknown or higher risk. Similarly, the TECS database contains enforcement, inspection, and intelligence records relevant to the anti-terrorism and law enforcement mission of CBP and numerous other federal agencies. Additionally,

the emails are records for law enforcement purposes as they were created by CBP personnel and directly related to the Plaintiff and his Dallas-Fort Worth International Airport encounter with CBP personnel.

50.    In these records, the disclosure of PII for the third parties and CBP personnel would constitute an unwarranted invasion of privacy.

51.    The identification of an individual in association with the performance of their duties at a law enforcement agency creates a safety threat and risks unwarranted attribution and attention to the employee beyond the confines of their job and into their personal life. Disclosing a non-public facing CBP employee's name (and related information), absent a compelling public interest to do so, risks unnecessarily exposing that individual employee to potential safety threats.

52.    Release of the identities of the CBP personnel and third parties in the responsive records would serve no public benefit or shed any light on the operations and activities of the agency, but instead would expose individual employees to potential harassment and an invasion of privacy. As such, the privacy interests of the third parties and CBP personnel identified in the responsive records outweigh any public interest in their release.

53.    For the reasons mentioned above, releasing the identities and other personally identifiable information of CBP personnel and third parties would cause a foreseeable harm. A release would allow these individuals to be targeted for reprisal or could lead to harassment, intimidation, physical harm, or even death.  The identification of an individual in association with the performance of their duties at a law enforcement agency creates a safety threat and risks unwarranted attribution and attention to the employee beyond the confines of his or her job and into his or her personal life.  Specifically, CBP employees have been subject to harassment, discrimination, and have received threats of physical harm solely because of their employment at

CBP. For example, in July 2019, at the CBP Tucson Field Office, multiple marked CBP vehicles parked in a non-government parking lot were vandalized overnight.  Further in June 2019, Border Patrol Agents in Idaho received threats via fax.  Also in June 2019, the group "Antifa" posted threats to law enforcement on social media threatening to use "acid milkshakes" to inflict chemical burns.  CBP employees also regularly receive threats on government phones by callers using altered numbers and spoofed voices and have been harassed on public transportation solely for their perceived affiliation with the DHS or CBP.  As a result of these types of incidents, the Office of Personnel Management ("OPM") designated CBP a "Security Agency" exempting all CBP employees, not just front-line law enforcement, from OPM's salary information disclosure policy. As OPM recognized, in this current environment, disclosing non-public facing CBP employee's names (and related information), absent a compelling public interest to do so, risks unnecessarily exposing that individual employee to potential safety threats.

> **D.    5 U.S.C. § 552(b)(7)(E): Records or Information Compiled for Law Enforcement Purposes that Would Disclose Techniques and Procedures for Law Enforcement Investigations or Prosecutions**

54.    In each record provided to the Plaintiff on June 29, 2022, CBP applied FOIA Exemption (b)(7)(E) to withhold law enforcement database queries and results, file names, codes, law enforcement related discussions, and different analyses performed by the agency when evaluating the Plaintiff for entry into the country and membership in the Global Entry program.

55.    FOIA Exemption (b)(7)(E) exempts from disclosure law enforcement records that would disclose techniques, procedures, or guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. Exemption (b)(7)(E) is designed to provide categorical protection for law enforcement techniques and procedures.

56.     All records responsive to Plaintiff's requests and appeals released in this litigation with redactions made were compiled for law enforcement purposes as they relate to CBP's border security enforcement mission.

57.     The information withheld from GES records consists of law enforcement techniques or procedures utilized by CBP Officers as they evaluate applicants for membership in a trusted traveler program. The redacted information highlights the exact factors considered by the agency for membership in a trusted traveler program as well as how the agency applies those factors in its risk analysis determination. The redacted information includes a listing of law enforcement databases queried, the modules accessed within those databases, the specific queries conducted in those modules, comments within the queries, and the results of those queries. It additionally includes database codes, file numbers, and other computer information pertaining to law enforcement databases. It further includes a risk assessment analysis performed by CBP personnel applying their expertise in evaluating whether Plaintiff meets eligibility criteria for membership in Global Entry.

58.     The risk assessment analysis contained in the GES records reveals CBP's priorities when vetting trusted traveler program applicants and members. The records not only reveal information about CBP's vetting activities generally, but also the kind of information CBP considered and evaluated with respect to Plaintiff's membership beyond what is made publicly available to applicants. They identify which pieces of information the agency deemed of significance, how that information was communicated to officers to inform their decision, and the relative importance of the different factors in determining whether a person is sufficiently low risk and otherwise meets program criteria.

59.     Bad actors armed with this information could circumvent the law and frustrate CBP's law enforcement efforts. If released, applicants and members could attempt to conceal any derogatory information on their record and fraudulently gain access to a trusted traveler program and potentially receive reduced scrutiny during inspections at the border. Releasing this information could further allow individuals previously unaware of law enforcement activity related to their actions to alter their patterns of conduct, adopt new methods of operation, or effectuate other countermeasures, all of which could frustrate CBP's ability to investigate potential violations of law.

60.     If unprotected, applicants and members could alter their behavior or manipulate their applications to thwart CBP efforts to secure the border and effectively make eligibility determinations per 8 C.F.R. § 235.12 and could facilitate the acceptance of high-risk travelers into trusted traveler programs. The acceptance of high-risk travelers into trusted traveler programs would create serious security risks at our nation's borders. Travelers who would otherwise be more likely to undergo enhanced inspection could take advantage of the privileges conferred to trusted traveler program members including expedited processing and entry at ports of entry. This could hinder CBP's efforts to interdict potentially dangerous travelers.

61.     CBP additionally redacted information within TECS records released to Plaintiff pursuant to (b)(7)(E). Such information includes TECS file and/or record numbers, incident type and numbers, incident comments, modules, and codes found in both the GES and TECS records released to Plaintiff. Additionally, this includes comments and non-public details about when, how, and under what circumstances certain investigative techniques are used regarding Plaintiffs encounter on January 3, 2021.

62.     Both the GES and TECS records released to Plaintiff contain references to TECS file numbers and database codes that could enable efforts to circumvent the law. The redacted information includes a listing of the modules accessed within TECS, the specific queries conducted in those modules, and the results of those queries. It additionally includes database codes, file numbers, and other computer information pertaining to the database. As described above, the release of this information could allow individuals to anticipate and avoid the law enforcement techniques practiced by the agency by attempting to conceal derogatory information, alter their patterns of conduct, adopt new methods of operation, or effectuate other countermeasures.

63.     Moreover, the release of this information could allow technologically advanced individuals to access and navigate the agency's law enforcement databases and alter, add, or delete information contained therein. This information could enable electronic trespassers to manipulate or delete database information, facilitate navigation or movement through the system, compromise the electronic records system, facilitate improper access to sensitive investigatory and other law enforcement records, impede effectiveness of law enforcement activities, and endanger agency investigatory practices and techniques.

64.     Protecting and maintaining the integrity of TECS is imperative in assisting CBP to meet its mission to secure against terrorists, their weapons, and other dangerous items from entering the United States. TECS is CBP's principal law enforcement and anti-terrorism database system, and it is one of the primary tools that CBP law enforcement officers regularly use to effectively and efficiently enforce border security and international trade laws. As previously provided, the TECS database contains enforcement, inspection, and intelligence records relevant to the anti-terrorism and law enforcement mission of CBP and numerous other federal agencies. DHS and CBP have taken considerable efforts to provide the public with detailed information regarding TECS without

compromising the integrity of the system via its System of Records Notice and Privacy Impact Assessment. As a fundamental law enforcement tool, there is a great need to defend TECS against any risk of compromise, not only to ensure the continuance of CBP's mission, but also to assist other law enforcement agencies which TECS may support.

65.     Despite the sensitivities of the system, CBP has released the vast majority of the information stored in TECS records related to Plaintiff's January 3, 2021 Dallas-Fort Worth airport encounter.

66.     However, CBP redacted the reason why Plaintiff was referred for secondary inspection while reentering the United States through the Dallas-Fort Worth airport on January 3, 2021. The range of reasons that might trigger the heightened scrutiny of secondary inspection including law enforcement techniques practiced by the agency while processing travelers for admission to the country and while enforcing U.S. border laws. Although a few factors used by CBP officers to conduct border inspections are in the public domain in court opinions or other contexts, certainly not all are, and the release of additional criteria helps bad actors piece together a mosaic of law enforcement techniques practiced by the agency that trigger heightened scrutiny. Moreover, such information could reveal the nature and extent of the government's law enforcement interest in particular situations. The release of this information could allow individuals to identify the specific circumstances in which CBP makes such a referral and, in turn, alter their behavior to avoid such a referral during future travel. Because this information can be used to clarify or predict a CBP officer's behavior in specific circumstances, there is significant risk in both circumvention and potentially to officer safety.

67.    The information could further reveal the capabilities of TECS, the release of which would impede CBP's law enforcement mission by alerting individuals to how CBP conducts searches of its systems and any system limitations.

68.    Additionally, disclosure of the codes used in certain data fields in TECS would reveal not only information unique to those particular inspections, but also how that information is communicated between officers.  Information about such "red flags," if unprotected, could enable individuals to thwart efforts to secure the border and enforce immigration and customs laws. Disclosure of this shorthand communication would serve no legitimate public interest, as its meaning would be irretrievably distorted once taken from the tightly controlled context in which it is created, interpreted, and shared solely by and between law enforcement personnel.

69.    For the reasons stated above, a release of the law enforcement sensitive information would cause a foreseeable harm to the agency and national security. Providing the information would cause irreparable harm to the agency and their standards on investigating individuals from leaving and entering the United States, posing an unreasonable risk to national security.  Additionally, releasing this information would cause foreseeable harm to the attorneys who otherwise would be limited in discussing matters related to the investigations of national security. Releasing the information that CBP redacted under exemption 7(E) in these records would give potential bad actors very specific law enforcement information, including internal security codes, record numbers, and investigatory details and how CBP responds and reacts to investigations. These materials deal directly with sensitive issues of CBP law enforcement procedures and practices of which if released would cause an irreparable harm to the agency and the national security. Such information would allow individuals to adjust their behavior and is reasonably expected to impede CBP's effectiveness and aid in circumvention of the law.

## IV.    DETERMINATION REGARDING SEGREGABILITY

70.    CBP carefully reviewed the responsive records on a line-by-line and page-by-page basis to identify reasonably segregable, non-exempt information. CBP has determined that there is no additional, meaningful, nonexempt information that may be reasonably segregated and released with disclosing information that warrants protection under a FOIA exemption. CBP has released all reasonably segregable information.

## V.    JURAT CLAUSE

I declare under penalty of perjury that the statements made in the forgoing Declaration are true and correct to the best of my knowledge, information, and belief.

Executed on  March 4, 2024

Shari Suzuki, Chief
FOIA Appeals and Policy Branch
Regulations and Rulings
Office of International Trade
U.S. Customs and Border Protection
U.S. Department of Homeland Security

*ADAM MALIK V. U.S. DEP'T OF HOMELAND SEC. ET AL.*, 22-0698 (CRC) (D.D.C.)
U.S. CUSTOMS AND BORDER PROTECTION, *VAUGHN* INDEX OF WITHHELD INFORMATION

| DOCUMENT NO. | DOCUMENT DESCRIPTION | PAGES | BASIS FOR WITHHOLDINGS |
|---|---|---|---|
| 1 | Global Enrollment System (GES) document. This document contains biographical information provided to U.S. Customs and Border Protection (CBP) by the plaintiff when he applied to participate in the Global Entry Trusted Traveler Program. It also contains entries made by CBP Officers as they reviewed plaintiff's information and as they processed and analyzed data received from sources, both within and outside CBP, as they evaluated plaintiff's eligibility for admission to and continued participation in the Trusted Traveler Programs. | 6 | GES documents are created and maintained by CBP for law enforcement purposes. The GES assists the Trusted Traveler Program Office in evaluating individuals for participation in expedited clearance programs for pre-approved, vetted, low-risk travelers upon entry to the United States.<br><br>FOIA Exemption (b)(6) is applied to certain elements of information in the GES records when that information is considered to fall within the scope of "Personally Identifiable Information." In the instant situation, the particular information is a unique alpha-numeric code which has been assigned to individual CBP Officers who have performed actions documented on the record. There is no public interest in knowing the identities of these individuals. Release of the information would not shed any light on the operation of the Trusted Traveler Programs.<br><br>FOIA Exemption (b)(7)(C) similarly protects the privacy of individuals whose personal information appears in records created for law enforcement purposes. Release of this information could reasonably be expected to constitute an unwarranted disclosure of personal information without any increase in information about governmental operations.<br><br>FOIA Exemption (b)(7)(E) has been applied to portions of information in these records which contain CBP's techniques and procedures related to the internal analytical processes utilized by CBP Officers as they assess risks and determine whether an individual should be admitted to or should continue to remain in a Trusted Traveler Program. The exact factors considered by the agency for membership in the program are not publicly known. Should these factors become known, it can be anticipated that applicants and members will attempt to conceal any derogatory information on their record or withhold certain information to avoid detection and thus enable them to avoid the type of rigorous evaluation demanded by the Trusted Traveler programs. Fraudulent members of the programs entitled to expedited processing while entering the United States would then be placed in a position to circumvent and frustrate agency |

*ADAM MALIK V. U.S. DEP'T OF HOMELAND SEC. ET AL.*, 22-0698 (CRC) (D.D.C.)
U.S. CUSTOMS AND BORDER PROTECTION, *VAUGHN* INDEX OF WITHHELD INFORMATION

|  |  |  | application of border security laws. Thus, CBP foresees that a harm to the interests protected by (b)(7)(E) is reasonably expected to occur if this information is publicly disclosed. |
|---|---|---|---|
| 2 | Risk Assessment Worksheet (Date Vetted 7/28/2014, Initial Enrollment Application).<br><br>The RAW documents the database queries and analyses performed by the Trusted Traveler Vetting Center when evaluating this particular applicant for initial enrollment in the Global Entry program. It includes a listing of law enforcement databases queried by the CBP's Trusted Traveler Vetting Center, the results of those queries, and comments and analysis entered by a CBP Officer regarding program eligibility for the applicant.<br><br>The databases queried are maintained by CBP and other law enforcement organizations. In the RAW, the databases are identified by coded designations. The results of the queries are listed, in shorthand form alongside the relevant database.<br><br>CBP analysts review the search results and based upon the totality of the results, make recommendations on whether an | 3 | The RAW is an integral component of the GES documents which are created and maintained by CBP for law enforcement purposes. The GES assists the Trusted Traveler Program Office in evaluating individuals for participation in expedited processing programs for pre-approved, vetted, low-risk travelers upon entry to the United States. The RAW contains information about the results of background investigations of Program applicants and members.<br><br>FOIA Exemption (b)(3) applies to information that is specifically exempted from disclosure by statute if that statute either requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue or establishes particular criteria for withholding or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3). In this RAW record, FOIA Exemption (b)(3) is asserted on behalf of the Transportation Security Administration ("TSA") to protect Sensitive Security Information (SSI) found in the responsive record. 49 U.S.C. §114(r) prohibits the disclosure of information that would be detrimental to the security of transportation if released. TSA regulations implementing Section 114(r) are found in 49 C.F.R. Part 1520. Pursuant to 49 C.F.R. §1520.5(b)(9), security screening procedures, including selection criteria for the screening of persons as well as information and sources of information used by a passenger or property screening program or system, including an automated screening system, is SSI and is therefore exempt from disclosure.<br><br>FOIA Exemption (b)(6) is applied to certain elements of information in the RAW records when that information is considered to fall within the scope of "Personally Identifiable Information." In the instant situation, the particular information is a unique alpha-numeric code which has been assigned to individual CBP Officers who have performed actions documented on the record. There is no public interest in knowing the identities of these individuals. Release of the information would not shed any light on the operation of the Trusted Traveler Programs. |

| | applicant satisfies the criteria for participation in a CBP Trusted Traveler Program. That recommendation is forwarded for a final determination by the CBP Vetting Center. | | FOIA Exemption (b)(7)(C) similarly protects the privacy of individuals whose personal information appears in records created for law enforcement purposes. Release of this information could reasonably be expected to constitute an unwarranted disclosure of personal information without any increase in information about governmental operations.<br><br>FOIA Exemption (b)(7)(E) is applied to certain elements of information in the RAW which are either coded designators of databases utilized by CBP as it performs background verification reviews on Trusted Traveler Program applicants and members, or the results of those reviews. This exemption is also applied to analyses conducted by CBP Officers which can appear in the record. Which databases CBP consults for specific applications are not generally known to the public, nor is the specific information considered by the Trusted Traveler Program Office when evaluating individuals for membership in the Trusted Traveler Programs. Disclosure of this information would reveal specific factors CBP considers when evaluating applicants for memberships. Release of this information could reasonably be expected to enable individuals who so desired to take measures designed to circumvent CBP's efforts to administer its programs and enforce the border security laws. |
| 3 | Risk Assessment Worksheet (Date Vetted 05/27/2019, Renewal Application).<br><br>The RAW documents the database queries and analyses performed by the Trusted Traveler Vetting Center when evaluating this particular applicant for continued membership in the Global Entry program. It includes a listing of law enforcement databases queried by the CBP's Trusted | 5 | The RAW is an integral component of the GES documents which are created and maintained by CBP for law enforcement purposes. The GES assists the Trusted Traveler Program Office in evaluating individuals for participation in expedited clearance programs for pre-approved, vetted, low-risk travelers upon entry to the United States. The RAW contains information about the results of background investigations of Program applicants and members.<br><br>FOIA Exemption (b)(5) is applied to the RAW by exempting from mandatory disclosure opinions, proposals, and recommendations included within inter-agency or intra-agency documentation and protects from disclosure the integrity of the deliberative or decision-making processes within the agency. CBP foresees that a harm to the interests protected by (b)(5) is reasonably expected to occur if this information is publicly |

| | | |
|---|---|---|
| Traveler Vetting Center, the results of those queries, and comments and analysis entered by a CBP Officer regarding program eligibility for the applicant.<br><br>The databases queried are maintained by CBP and other law enforcement organizations.  In the RAW, the databases are identified by coded designations.  The results of the queries are listed, in shorthand form alongside the relevant database.<br><br>CBP analysts review the search results and based upon the totality of the results, make recommendations on whether an applicant satisfies the criteria for participation in a CBP Trusted Traveler Program.  That recommendation is forwarded to the CBP Enrollment Center for a final determination. | | disclosed, as the release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel. Because this RAW contains a recommendation made by CBP personnel that was not ultimately part of the agency's final decision and proposed during the deliberative process before a final decision was made, it therefore falls within the scope of FOIA exemption (b)(5) and would cause a foreseeable harm to the agency.<br><br>FOIA Exemption (b)(6) is applied to certain elements of information in the RAW records when that information is considered to fall within the scope of "Personally Identifiable Information." In the instant situation, the particular information is a unique alpha-numeric code which has been assigned to individual CBP Officers who have performed actions documented on the record. There is no public interest in knowing the identities of these individuals. Release of the information would not shed any light on the operation of the Trusted Traveler Programs.<br><br>FOIA Exemption (b)(7)(C) similarly protects the privacy of individuals whose personal information appears in records created for law enforcement purposes. Release of this information could reasonably be expected to constitute an unwarranted disclosure of personal information without any increase in information about governmental operations.<br><br>FOIA Exemption (b)(7)(E) is applied to certain elements of information in the RAW which are either coded designators of databases utilized by CBP as it performs background verification reviews on Trusted Traveler Program applicants and members, or the results of those reviews.  This exemption is also applied to analyses conducted by CBP Officers which can appear in the record.  Which specific databases CBP queries are not generally known to the public, nor is the specific information considered by the Trusted Traveler Vetting Center when evaluating individuals for membership in the Trusted Traveler Programs. Release of this information could reasonably be expected to enable individuals who so desired to take measures designed to circumvent CBP's efforts to administer its programs and enforce the border security laws. |

*ADAM MALIK V. U.S. DEP'T OF HOMELAND SEC. ET AL.*, 22-0698 (CRC) (D.D.C.)
U.S. CUSTOMS AND BORDER PROTECTION, *VAUGHN* INDEX OF WITHHELD INFORMATION

| 4 | January 4 and 5, 2021 Email Discussions Regarding Plaintiff and his January 3, 2021 DFW International Airport Encounter. These communications are between CBP employees at the Dallas/Fort Worth Airport and the CBP Office of Chief Counsel. | 15 | These email discussions are between CBP employees at Dallas/Fort Worth Airport and CBP Office of Chief Counsel regarding the Plaintiff's interaction.

FOIA Exemption (b)(5) is applied to the email discussions as Exemption (b)(5) protects from disclosure the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions, conclusions, and recommendations included within inter-agency or intra-agency documentation. The release of this internal information would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel. The emails contain recommendations made by CBP personnel, and therefore falls within the scope of FOIA exemption (b)(5).

Additionally, Exemption (b)(5) protects from disclosure information that is protected under the Attorney Client Privilege. These emails involve CBP's Office of Chief Counsel discussing the matter in litigation and which are confidential communications between the CBP attorney and CBP relating to a legal matter for which CBP has sought professional advice. Here, this exemption has been applied to withhold email communications between the Office of Chief Counsel which contains interpretations of law and advice presented to certain CBP staff at Dallas/Fort Worth Airport. This material has not been disclosed outside the agency and fits squarely within the bounds of the exemption and has been properly redacted.

FOIA Exemption (b)(6) is applied to certain elements of information in the email records when that information is considered to fall within the scope of "Personally Identifiable Information." In the instant situation, the particular information are names, email addresses, phone numbers, and physical address locations which are assigned to individual CBP employees who are documented throughout the email record. There is no public interest in knowing this information about these individuals. Release of the information would not shed any light on the operation of CBP. |

| | | | FOIA Exemption (b)(7)(C) similarly protects the privacy of individuals whose personal information appears in records created for law enforcement purposes. Release of this information could reasonably be expected to constitute an unwarranted disclosure of personal information without any increase in information about governmental operations. |
| | | | |
| | | | FOIA Exemption (b)(7)(E) is applied to certain information within the emails which discuss law enforcement sensitive matters. This exemption is also applied to analyses in the email records. Such protocols are not generally known to the public as it regards to traveler inspections. A release of this information could reasonably be expected to enable individuals who so desired to take measures designed to circumvent CBP's efforts to administer its programs and enforce the border security laws. |
| 5 | TECS - Person Query Detail Record | 2 | FOIA Exemption (b)(3) applies to information that is specifically exempted from disclosure by statute if that statute either requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue or establishes particular criteria for withholding or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3). In this person query, FOIA Exemption (b)(3) is asserted on behalf of the Transportation Security Administration ("TSA") to protect a very small amount of Sensitive Security Information (SSI) found in the responsive record. 49 U.S.C. §114(r) prohibits the disclosure of information that would be detrimental to the security of transportation if released. TSA regulations implementing Section 114(r) are found in 49 C.F.R. Part 1520. Pursuant to 49 C.F.R. §1520.5(b)(9), security screening procedures, including selection criteria for the screening of persons as well as information and sources of information used by a passenger or property screening program or system, including an automated screening system, is SSI and is therefore exempt from disclosure. |
| | | | |
| | | | FOIA Exemption (b)(6) is applied to certain elements of information in the records when that information is considered to fall within the scope of "Personally Identifiable Information." In the instant situation, the particular information are names and phone numbers assigned to individual CBP employees who are documented within the record. There |

| | | | |
|---|---|---|---|
| | | | is no public interest in knowing this information about these individuals, and the release of the information would not shed any light on the operations of CBP.<br><br>FOIA Exemption (b)(7)(C) similarly protects the privacy of individuals whose personal information appears in records created for law enforcement purposes. Release of this information could reasonably be expected to constitute an unwarranted disclosure of personal information without any increase in information about governmental operations.<br><br>Exemption (b)(7)(E) is applied as the basis to redact information that would reveal CBP procedures for screening and inspecting international travelers (i.e., examination and inspection procedures, names of specific law enforcement databases used, procedures related to external/internal coordination/reporting, information which would reveal the scope and focus of certain law enforcement techniques, particular types of secondary inspection, clearance or authorization procedures, names of specific equipment or capabilities used, and instructions on how to process certain information). A release of this information would reveal CBP targeting and inspection techniques used in processing international travelers. Such a release would enable potential violators to design strategies to circumvent the examination procedures developed and employed by CBP in its mission to secure the border and enforce immigration laws by allowing potential violators to better prepare themselves to evade and exploit U.S. immigration and other laws. |
| 6 | TECS - Incident Log Report - Detail | 2 | FOIA Exemption (b)(6) is applied to certain elements of information in the records when that information is considered to fall within the scope of "Personally Identifiable Information." In the instant situation, the particular information are names, phone numbers, birthdays, birthplace, and passport number of CBP employees and/or third parties who are documented within the record. There is no public interest in knowing this information about these individuals, and the release of the information would not shed any light on the operations of CBP. |

*ADAM MALIK V. U.S. DEP'T OF HOMELAND SEC. ET AL.*, 22-0698 (CRC) (D.D.C.)
U.S. CUSTOMS AND BORDER PROTECTION, *VAUGHN* INDEX OF WITHHELD INFORMATION

| | | | |
|---|---|---|---|
| | | | FOIA Exemption (b)(7)(C) similarly protects the privacy of individuals whose personal information appears in records created for law enforcement purposes. Release of this information could reasonably be expected to constitute an unwarranted disclosure of personal information without any increase in information about governmental operations.<br><br>Exemption (b)(7)(E) is applied as the basis to redact information that would reveal CBP procedures for screening and inspecting international travelers (i.e., examination and inspection procedures, names of specific law enforcement databases used, procedures related to external/internal coordination/reporting, information which would reveal the scope and focus of certain law enforcement techniques, particular types of secondary inspection, clearance or authorization procedures, names of specific equipment or capabilities used, and instructions on how to process certain information). A release of this information would reveal CBP targeting and inspection techniques used in processing international travelers. Such a release would enable potential violators to design strategies to circumvent the examination procedures developed and employed by CBP in its mission to secure the border and enforce immigration laws by allowing potential violators to better prepare themselves to evade and exploit U.S. immigration and other laws. |
| 7 | TECS - Secondary Inspection Report – 1/3/2021 | 4 | FOIA Exemption (b)(6) is applied to certain elements of information in the records when that information is considered to fall within the scope of "Personally Identifiable Information." In the instant situation, the particular information redacted include names, birthdays, birthplaces, alien numbers, and fingerprint numbers of CBP employees and/or third parties who are documented within the record. There is no public interest in knowing this information about these individuals, and the release of the information would not shed any light on the operations of CBP.<br><br>FOIA Exemption (b)(7)(C) similarly protects the privacy of individuals whose personal information appears in records created for law enforcement purposes. Release of this information could reasonably be expected to constitute an unwarranted disclosure of personal information without any increase in information about governmental operations. |

| | | | |
|---|---|---|---|
| | | | Exemption (b)(7)(E) is applied as the basis to redact information that would reveal CBP procedures for screening and inspecting international travelers (i.e., examination and inspection procedures, names of specific law enforcement databases used, procedures related to external/internal coordination/reporting, information which would reveal the scope and focus of certain law enforcement techniques, particular types of secondary inspection, clearance or authorization procedures, names of specific equipment or capabilities used, and instructions on how to process certain information). A release of this information would reveal CBP targeting and inspection techniques used in processing international travelers. Such a release would enable potential violators to design strategies to circumvent the examination procedures developed and employed by CBP in its mission to secure the border and enforce immigration laws by allowing potential violators to better prepare themselves to evade and exploit U.S. immigration and other laws. |
| 8 | TECS - Secondary Inspection Report – 1/16/2021 | 4 | FOIA Exemption (b)(6) is applied to certain elements of information in the records when that information is considered to fall within the scope of "Personally Identifiable Information." In the instant situation, the particular information redacted include names, birthdays, birthplaces, alien numbers, and fingerprint numbers of CBP employees and/or third parties who are documented within the record. There is no public interest in knowing this information about these individuals, and the release of the information would not shed any light on the operations of CBP.<br><br>FOIA Exemption (b)(7)(C) similarly protects the privacy of individuals whose personal information appears in records created for law enforcement purposes. Release of this information could reasonably be expected to constitute an unwarranted disclosure of personal information without any increase in information about governmental operations.<br><br>Exemption (b)(7)(E) is applied as the basis to redact information that would reveal CBP procedures for screening and inspecting international travelers (i.e., examination and inspection procedures, names of specific |

| | | | |
|---|---|---|---|
| | | | law enforcement databases used, procedures related to external/internal coordination/reporting, information which would reveal the scope and focus of certain law enforcement techniques, particular types of secondary inspection, clearance or authorization procedures, names of specific equipment or capabilities used, and instructions on how to process certain information). A release of this information would reveal CBP targeting and inspection techniques used in processing international travelers. Such a release would enable potential violators to design strategies to circumvent the examination procedures developed and employed by CBP in its mission to secure the border and enforce immigration laws by allowing potential violators to better prepare themselves to evade and exploit U.S. immigration and other laws. |
| 9 | TECS - Electronic Media Report 1/3/2021 | 3 | FOIA Exemption (b)(6) is applied to certain elements of information in the electronic media report record when that information is considered to fall within the scope of "Personally Identifiable Information." In the instant situation, the particular information redacted include names, birthdays, birthplaces, alien numbers, and fingerprint numbers of CBP employees and/or third parties who are documented within the record. There is no public interest in knowing this information about these individuals, and the release of the information would not shed any light on the operations of CBP.<br><br>FOIA Exemption (b)(7)(C) similarly protects the privacy of individuals whose personal information appears in records created for law enforcement purposes. Release of this information could reasonably be expected to constitute an unwarranted disclosure of personal information without any increase in information about governmental operations.<br><br>Exemption (b)(7)(E) is applied as the basis to redact information that would reveal CBP procedures for screening and inspecting international travelers (i.e., examination and inspection procedures, names of specific law enforcement databases used, procedures related to external/internal coordination/reporting, information which would reveal the scope and focus of certain law enforcement techniques, particular types of secondary inspection, clearance or authorization procedures, names of specific |

*ADAM MALIK V. U.S. DEP'T OF HOMELAND SEC. ET AL.*, 22-0698 (CRC) (D.D.C.)
U.S. CUSTOMS AND BORDER PROTECTION, *VAUGHN* INDEX OF WITHHELD INFORMATION

| | | | |
|---|---|---|---|
| | | | equipment or capabilities used, and instructions on how to process certain information). A release of this information would reveal CBP targeting and inspection techniques used in processing international travelers. Such a release would enable potential violators to design strategies to circumvent the examination procedures developed and employed by CBP in its mission to secure the border and enforce immigration laws by allowing potential violators to better prepare themselves to evade and exploit U.S. immigration and other laws. |
| 10 | Airport Technical Design Standard: November 2017 | 460 | Released in Full |
| 11 | CBP Security Policy and Procedures Handbook; August 13, 2009 | 908 | Released in Full |