## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ADAM MALIK**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF HOMELAND SECURITY, et al.**, <br><br> Defendants. | Case No. 22-cv-698 (CRC) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Texas immigration attorney Adam Malik has a complicated history with the federal government. A former employee of the Department of Homeland Security who once aspired to be an FBI agent, he alleges a pattern of mistreatment by the very agencies he sought to serve. The Freedom of Information Act ("FOIA") requests at issue in this case arise from an incident he views as emblematic of that pattern. In January 2021, while attempting to re-enter the United States at a Global Entry kiosk at the Dallas Fort Worth International Airport, Malik claims immigration officers denied him entry, interrogated him, seized his phone, threatened his arrest, and physically assaulted him. Seeking records related to this event and the subsequent revocation of his Global Entry membership, Malik submitted FOIA requests to five separate agencies. The agencies responded and, finding the responses lacking, Malik sued.

Now before the Court are cross-motions for summary judgment. For the reasons explained below, the Court will largely grant summary judgment to the agencies and deny Malik's motion, except as to one record withheld by United States Citizenship and Immigration Services.

I.     **Background**

A.   Factual Background

Plaintiff Adam Malik is a Texas attorney who "has built a practice of representing individuals in U.S. Immigration and Naturalization matters."  ECF 37 (Pl.'s Mot. Summ. J. ("PSJ")) at 1.  Prior to entering private practice, Malik worked for the Department of Homeland Security ("DHS") through United States Citizenship and Immigration Services ("USCIS") and Immigration and Customs Enforcement ("ICE").  Id.  Before that, he had applied to be a Special Agent and Contract Linguist for the FBI.  See id. at 1, 8–9.

Malik alleges a long history of mistreatment at the hands of the federal government, which he claims has "targeted[]" him "for many years" "in an effort to discriminate, harass, embarrass, retaliate, scare, and/or seek retribution against [him] for the work that he does and for other reasons."  ECF 1 ("Compl.") ¶ 24.  On January 3, 2021, after traveling back to the United States from Cuba, Malik attempted to enter the country through a Global Entry kiosk at the Dallas Fort Worth ("DFW") International Airport.  PSJ at 1–2.  Global Entry is a Customs and Border Protection ("CBP") Trusted Traveler Program "that allows expedited clearance for pre-approved, low-risk travelers upon arrival in the United States."  Global Entry, CBP, https://www.cbp.gov/travel/trusted-traveler-programs/global-entry (last modified Nov. 27, 2024). Malik alleges that, although his Global Entry membership was active, he was rejected entry at the kiosk and transferred to another area for inspection.  PSJ at 1–2.  He claims he was then interrogated by three CBP officers about his law practice, personal life, parents, and immigration history.  Id. at 2.  And, when he refused to unlock his phone because it contained attorney-client communications, he alleges the officers seized it.  Id.  According to Malik, he was eventually

moved to the exit, where one of the officers threatened to arrest him before physically assaulting

him. Id.

Malik asserts that his Global Entry membership was subsequently revoked, he believes in

retaliation for his refusal to answer certain questions or unlock his phone. See id. at 19. Seeking

more information, he submitted FOIA requests to the five agencies named as defendants in this

case: (1) CBP, (2) USCIS, (3) ICE, (4) FBI, and (5) the National Archives and Records

Administration ("NARA").[1] Id. at 2–5; ECF 31-1 (Def.'s Statement of Undisputed Material

Facts ("DSUMF")) ¶¶ 1–6.

### 1.  CBP

Malik lodged four requests with the CBP.  His first, in January 2021, sought:

1.  All information pertaining to the seizure of my iphone at DFW airport on
    January 3, 2021.

2.  All information pertaining to the use and handling of my iphone.

3.  All the information pertaining to the use and handling of the information
    obtained from and/or through my iphone.

4.  The information obtained from and/or through my iphone.

5.  All information regarding the destruction of information obtained from
    and/or through my iphone.

6.  All information pertaining to the Filter Team's review of information
    obtained from and/or through my iphone.

7.  All information pertaining to CBP's coordination of the review of the above
    information with the US Attorney's Office.

8.  All information pertaining to the revocation of my Global Entry.

9.  All information pertaining to my selection for secondary inspection at the

---

[1] Malik also filed suit against the Department of Homeland Security in the Northern
District of Texas based on this encounter with CBP.  See ECF 39 ("Malik Decl. & Exs.") at 70
(page numbers designated by CM/ECF); PSJ at 18.

> DFW airport on January 3, 2021.
>
> 10.    All emails pertaining to me since December 20, 2020.

DSUMF ¶ 1; <u>see also</u> PSJ at 2–3.  Two months later, he submitted another request,

seeking:

> A copy of the video(s) from all cameras located at the DFW airport's CBP secured area from January 03, 2021, that show Officer Brock Allen and Supervisory Officer Aaron Sullivan escorting the subject (Adam Malik, **/**/1977) from the secondary inspection area on the second floor to the exit on the first floor, where Supervisory Officer Aaron Sullivan became aggressive and assaulted Mr. Adam Malik from behind.

DSUMF ¶ 2 (alteration omitted); <u>see also</u> PSJ at 3.  A third request followed, this time

for:

> 1.    Information or document(s) that references the protocol or the rule regarding the keeping of the video records at the CBP secure locations inside the airports in general and DFW airport terminal D (Immigration and Customs inspection area) specifically.
>
> 2.    Information or document(s) that names the agency or entity, other than CBP, that may have a copy of the camera recordings from DFW airport's CBP secured area terminal D from January 03, 2021, approximately around 21:17 CST.
>
> 3.    The Standard Operating Procedures (SOP) on how the video records are kept, handled, held, retained, transferred, entrusted, or saved by/with a separate/different agency/entity, specifically for CBP DFW airport. Or what happens to the video recordings at the DFW airport's CBP secured area terminal D from January 03, 2021, approximately around 21:17 CST (Immigration and Customs inspection area) when they are no longer "retained."
>
> 4.    Information or document(s) that name(s) of the agency/office/ department/individual/ entity that may have a copy of the video that is subject of this foia, or the name(s) of the agency/office/department/individual/entity that is the custodian of the records that includes the video from DFW airport's CBP secured area terminal D from January 03, 2021, approximately around 21:17 CST.

DSUMF ¶ 3; see also PSJ at 3.

Finally, over a year after his first, Malik submitted a fourth and final request to

CBP:

> Subject of this FOIA request is Adam Malik (DOB **/**/1977).
>
> 1.     Copies of all applications made by the subject for Global Entry
>        Applications.
>
> 2.     Any information, documents, records related to the subject's Global Entry
>        Applications.
>
> 3.     Any notes or records created by CBP employees or contractors related to
>        the Global Entry account or membership.
>
> 4.     Any and all information, data, records, notes, documents, logs that were
>        considered AND became the basis the revocation of the subject's Global
>        Entry membership.
>
> 5.     Copy of the report or log that was created by Supervisory CBP Officer
>        Aaron Sullivan out of DFW airport that was also considered as the basis of
>        the revocation for the subject's Global entry.

DSUMF ¶ 4; see also PSJ at 4.

### 2. USCIS, ICE, and FBI

In March 2021, Malik also submitted identical FOIA requests to USCIS, ICE, and FBI:

> **First, I request** for the Information Technology department to search its email
> systems and/or other communications methods and provide me with copies of the
> records that result from the search pertaining to me based on the following criteria.
> The information requested includes but is **NOT limiting to the following**
> independent parameters.
>
> 1.  The time frame for this request is between Jan 2002 until the data search is
>     executed.
>
> 2.  This is to include any communication where my name appears in the subject
>     line or within the body of the communication.
>
> 3.  This is to include ALL variations of my name as "Aman" or "Aman Malik" or
>     "Adam Malik" or "Adam A Malik" or "Adam Arman Malik" or "Attorney
>     Malik" or "Attorney Adam Malik".
>
> 4.  This is to include communication **from** any account/account holder.   (An
>     example of an account is an email address.)

5. This is to include communication **to** any account/account holder. (An example of an account is an email address.)

6. This request includes all email account addresses that end with "@uscis.dhs.gov", "@dhs.gov", "@uscis.gov" or any other domain extensions used by the preceding agencies or times.

7. This is to include all accounts AND email account, which any individual that works for or at the United States Citizenship and Immigration Services, uses or has access to.

8. This request includes any entities, individuals, or organization, contractors that either work directly or indirectly with the agency or department.

9. This request includes ALL folders within an account or email mailbox, which includes but is not limited to the following:

   a. This request is NOT limited to the "inbox" Folder.

   b. This request is NOT limited to the "Sent" Folder.

   c. This request is NOT limited to the "Draft" Folder.

   d. This request is NOT limited to the "Junk" Folder.

   e. This request is NOT limited to the "Deleted" Folder.

   f. This request is NOT limited to the "Deleted Items" Folder.

   g. This request is NOT limited to the "Junk Email" Folder.

   h. This request is NOT limited to the "Archived Email" Folder, other otherwise archived emails.

   i. This request is INCLUDES any other folder that exist in each account/email mailbox.

   j. This request is INCLUDES any other folder that are created by a user in each account/email mailbox.

**Secondly**, to the request above to the IT department, I also make the following **request** to the FOIA/PA officer.

Provide to me with copies of any documents, records, information, and files, whether digital or physical, pertaining to myself and in reference to the following:

1. All documents contained within or related to my Personal file and/or Human Resource file kept by the department and the agency.

2. All document related to my employment applications and/or employment with the department and the agency.

3. All documents related to my background and security checks in reference to my employment with the department or the agency.

4. All documents, records, information, and files kept related to me kept by the department or the agency.

DSUMF ¶ 5; see also PSJ at 4–5.

> ### 3. NARA

Finally, in June 2021, Malik submitted a FOIA request to NARA's National Personnel

Records Center, Civilian Personnel Records for:

> a copy of all and complete documentation and information related to my federal service with the United States Department of Homeland Security. This request includes, but is not limited to, my personal file, background and security clearance, medical records, and any other information or records held in relation to my employment.

DSUMF ¶ 6; see also PSJ at 5.  Malik provided the agency with relevant identifying

information for himself and his employment with DHS.  DSUMF ¶ 7.

B. Procedural Background

The Court will describe the agencies' FOIA productions in the analysis section below.

For now, it notes that Malik, dissatisfied with the agencies' initial responses and withholdings,

filed suit in March 2022 for FOIA violations.  See Compl.  The agencies continued searching,

processing, and producing records.  See, e.g., ECF 9 (August 2022 Joint Status Report updating

the Court on agencies' progress).  After mediation failed, see ECF 29 at 2, the parties cross-

moved for summary judgment.

## II.    Legal Standards

FOIA requires federal agencies to make their records available to the public upon request, unless those records fall within one of nine exempt categories.  Oglesby v. U.S. Dep't of Army, 79 F.3d 1172, 1176 (D.C. Cir. 1996).  "Summary judgment is the typical mechanism to determine whether an agency has met its FOIA obligations."  Assassination Archives & Rsch. Ctr. v. CIA, 657 F. Supp. 3d 95, 99 (D.D.C. 2023) (Cooper, J.).  To prevail on summary judgment in a FOIA case, an agency must show it made a "good faith effort" to locate the requested records using reasonable search methods.  Reps. Comm. for Freedom of the Press v. FBI ("Reps. Comm. I"), 877 F.3d 399, 402 (D.C. Cir. 2017) (quoting Oglesby v. U.S. Dep't of Army ("Oglesby I"), 920 F.2d 57, 68 (D.C. Cir. 1990)).  An agency can satisfy this burden with a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched."  Id. (quoting Oglesby I, 920 F.2d at 68).  An agency "must also justify any withholdings it has made pursuant to a FOIA exemption."  Assassination Archives & Rsch. Ctr., 657 F. Supp. 3d at 100.

If the record raises substantial doubt about a search's adequacy—for example, where the requests were well-defined and there are "positive indications of overlooked materials"— summary judgment is inappropriate.  Shapiro v. U.S. Dep't of Just., 40 F.4th 609, 613 (D.C. Cir. 2022) (quoting Reps. Comm. I, 877 F.3d at 402)).  A district court, however, is not responsible for "uncovering" whether other responsive documents exist; instead, it must assess only whether the search was "adequate."  In re Clinton, 973 F.3d 106, 116 (D.C. Cir. 2020) (citation omitted).  And "it is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate."  Iturralde v. Comptroller of Currency, 315 F.3d 311,

315 (D.C. Cir. 2003).  "Rather, the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  Id. Discovery in FOIA cases is "rare" and should be ordered only when there is evidence of "bad faith" in the agency's search.  Shapiro, 40 F.4th at 615 (quoting In re Clinton, 973 F.3d at 113).

"A party opposing a summary judgment motion who does not address an argument advanced in the motion is deemed to have conceded the argument."  Hairston v. Boardman, 915 F. Supp. 2d 155, 160 (D.D.C. 2013); see also CSX Transp., Inc. v. Com. Union Ins. Co., 82 F.3d 478, 482 (D.C. Cir. 1996) (affirming summary judgment and noting that "district court could have determined" choice-of-law argument had been forfeited).

**III.  Analysis**

The agencies argue their searches were adequate and exemptions justified certain withholdings.  See ECF 31 (Def.'s Mot. Summ. J. ("DSJ")) at 7, 15–35.  Malik does not directly address these claims but broadly asserts that "[m]aterials which are known to exist have not been produced," implying bad faith.  ECF 44 ("Pl.'s Reply") at 1.  He contends that this bad faith justifies discovery, summary judgment in his favor, or at least denial of the government's motion.  PSJ at 1.  The Court will assess each agency's response to Malik's requests.

A.  CBP

The Court begins with Malik's four requests to the CBP, which all relate to his January 3, 2021, interaction with agency officers at the DFW airport and his Global Entry application and revocation.  In support of its motion for summary judgment, CBP submits a declaration from Sharon Suzuki, the FOIA Appeals Officer and Chief of the FOIA Appeals and Policy Branch at the CBP, and a Vaughn index justifying its withholdings.  ECF 31-2 ("Suzuki Decl.").  According to Ms. Suzuki, in response to Malik's request, multiple attorneys in her branch

searched "the TECS and Global Enrollment System [GES] platforms" using the name and birthdate Malik provided.  <u>Id.</u> ¶ 23.  The TECS platform is "an overarching law enforcement information collection, analysis, and sharing environment that securely links telecommunications devices and personal computers to a central system and database" and "includes border crossing information on travelers entering and departing the United States."  <u>Id.</u> ¶ 24.  The GES platform, meanwhile, is "an official system of records for CBP's trusted traveler programs."  <u>Id.</u> ¶ 25. CBP's FOIA Appeals and Policy Branch also contacted CBP's Dallas Forth Worth Office of Field Operations ("DFWOFO") for records "because of their participation" in Malik's January 3, 2021, interaction with the agency.  <u>Id.</u> ¶ 26.  From these searches, CBP identified and produced 44 pages of responsive records, which it released in part, and two CBP policy manuals, which it released in full.  <u>See</u> ECF 18 at 1 (page numbers designated by CM/ECF); ECF 31-2 at 24–34 (page numbers designated by CM/ECF) (CBP <u>Vaughn</u> Index).

### 1. *Adequacy of CBP's Search*

CBP is entitled to summary judgment because it conducted an adequate search for Malik's requested documents.  Suzuki's declaration sufficiently describes the mechanics of CBP's search, including which platforms were searched, the way they were searched, and the results of the searches.  And searching for Malik's name and birthdate was sufficient.  <u>See</u> <u>Poitras v. U.S. Dep't of Homeland Sec.</u>, 303 F. Supp. 3d 136, 161 (D.D.C. 2018) (finding adequate CBP's search of TECS database using plaintiff's name and date of birth); <u>Strunk v. U.S. Dep't of State</u>, 845 F. Supp. 2d 38, 44 (D.D.C. 2012) (same).

Malik does not challenge Suzuki's declaration or the adequacy of the search it describes. Rather, he argues that the fault lies in the search's results—specifically, CBP's failure to produce any video of his interaction with CBP on January 3, 2021, and documents he allegedly

received from CBP during discovery in a separate lawsuit arising from the same incident.  See
PSJ 16–22.  But Malik cannot rebut the CBP's affidavit with "purely speculative claims about
the existence and discoverability of other documents."  SafeCard Servs., Inc. v. SEC, 926 F.2d
1197, 1200 (D.C. Cir. 1991) (citation omitted).

First, CBP explained why video of the interaction was not produced:  The agency retains
videos for only 90 days.  Suzuki Decl. ¶ 13.  DFWOFO conducted its search sometime after
April 7, 2021—outside the window within which the video of Malik's encounter with CBP
would have been saved.  See id. ¶¶ 12–13.  Accordingly, it is plausible that CBP did not find
video footage of the encounter.  Malik responds that the deposition testimony of CBP officers in
another case suggests "the video existed, still exists, and has not been deleted."  PSJ at 17.  But
nothing in the officers' cited testimony contradicts CBP's explanation.  To the contrary, while
one CBP officer testified at a deposition that CBP does "have cameras" in that area of the airport,
that officer also explicitly stated he did not "know how long" footage from those cameras
"stay[ed] on the server."  ECF 39 ("Malik Decl. & Exs.") at 154–55 (page numbers designated
by CM/ECF).  Second, while Malik claims CBP neglected to release documents it produced
during discovery in a different lawsuit he brought arising from the same incident, he has not
introduced proof that such documents exist.  In the absence of such "positive indications of
overlooked materials," the Court has no reason to find the search inadequate.  Shapiro, 40 F.4th
at 613 (citation omitted).

### 2. Withholdings and Exemptions

Malik speculates that CBP failed to produce evidence that his Global Entry was revoked
"as retaliation for the DFW incident."  PSJ at 19.  While acknowledging that CBP produced his

Global Entry application and renewal, he objects that they were "heavily redacted," with "[e]ven the date of the revocation" withheld.  Id.

Beyond this general objection, however, Malik does not specify which redactions he challenges or identify the documents containing them.  Given CBP's Vaughn index descriptions, the Court finds that the Global Entry application, renewal, and revocation are most likely contained in a GES document and two Risk Assessment worksheets.  These records include biographical information Malik provided to CBP as part of his Global Entry application, database queries, and background checks used in his Trusted Traveler vetting.  ECF 31-2 at 24–27.  The remaining documents appear to pertain to Malik's DFW airport encounter or internal CBP policies.  See id. at 28–34.

Because Malik has not addressed CBP's withholdings in those other documents, he has effectively conceded the agency's application of exemptions to them.  See Hairston, 915 F. Supp. 2d at 160; CSX Transp., Inc., 82 F.3d at 482.  The Court will therefore assess only the exemptions CBP applied to the GES document and Risk Assessment worksheets.

### a.  Exemption 3

FOIA Exemption 3 applies to information protected from disclosure by statute if (1) the statute meets Exemption 3's requirements and (2) the withheld information falls within the statute's scope.  Labow v. U.S. Dep't of Just., 831 F.3d 523, 527 (D.C. Cir. 2006).  Here, CBP invoked Exemption 3 on behalf of the Transportation Security Administration ("TSA") to withhold Sensitive Security Information ("SSI") in the Risk Assessment Worksheet prepared for Malik's initial application under the Homeland Security Act, 49 U.S.C. § 114(r).  ECF 31-2 at 25.

Section 114(r) requires TSA to implement regulations prohibiting disclosure of information that would "(A) be an unwarranted invasion of personal privacy; (B) reveal a trade secret or privileged or confidential commercial or financial information; or (C) be detrimental to the security of transportation."  Courts have recognized that § 114(r) meets Exemption 3's requirements.  Magassa v. TSA, No. 23-cv-2526 (LLA), 2025 WL 561296, at *3 (D.D.C. Feb. 20, 2025); see also U.S. Dep't of Homeland Sec. v. MacLean, 574 U.S. 383, 398 (2015) (acknowledging that § 114(r) allows agencies to deny FOIA requests).  And the withheld information—law-enforcement database queries by CBP's Trusted Traveler Vetting Center, the results of those queries, and a CBP officer's comments and analysis on program eligibility—falls within the definition of SSI:  A regulation interpreting the statute classifies as SSI such security screening procedures, "including selection criteria," "comments," "instructions," and "[i]nformation and sources of information used by . . . screening program[s]."  49 C.F.R. § 1520.5(b)(9)(i),(ii).  Thus, CBP properly applied Exemption 3.

### b.  Exemption 5

CBP also redacted part of the Risk Assessment Worksheet prepared for Malik's renewal application under Exemption 5, which protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption "covers records that would be 'normally privileged in the civil discovery context[,]'" including under "the deliberative-process privilege, the attorney-client privilege, and the attorney work-product privilege."  Nat'l Ass'n of Crim. Def. Laws. v. U.S. Dep't of Just. Exec. Off., 844 F.3d 246, 249 (D.C. Cir. 2016) (quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975)).

The deliberative process privilege "protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated.'"  Waterman v. IRS, 61 F.4th 152, 156 (D.C. Cir. 2023) (quoting NLRB, 421 U.S. at 150).  "To properly invoke Exemption 5, an agency must show that withheld documents are 'both predecisional and deliberative.'"  Id. (quoting U.S. Fish & Wildlife Serv. v. Sierra Club, Inc., 592 U.S. 261, 273 (2021)).

CBP properly asserted Exemption 5 to withhold a CBP Risk Assessor's recommendation on Malik's Global Entry renewal application under the deliberative-process privilege.  Such recommendations are "predecisional and deliberative" documents, U.S. Fish & Wildlife Serv., 592 U.S. at 273, as they inform but do not necessarily determine final decisions.  Here, for example, CBP represents that the Risk Assessor's recommendation was not part of the agency's final decision.  ECF 31-2 at 26–27.

CBP further explained that disclosing this information would pose a "foreseeable harm" by exposing how CBP conducts investigations and processes status recommendations.  Suzuki Decl. ¶ 40.  It would reveal "draft decisions and opinions that CBP may or may not have adopted," potentially enabling applicants to "manipulate" future applications.  Id. ¶¶ 0–41.  Moreover, the Risk Assessment Worksheet documents how recommendations evolve "through [the] chain of command," and its release could compromise the integrity of the application process by "reveal[ing] how recommendations are revised," "approved," or "rejected."  Id. ¶ 41.  Accordingly, the agency provided a plausible explanation (which Malik does not contest) of how full disclosure of this document could chill internal discussions, discourage candid assessments and recommendations, and undermine the effectiveness of CBP's decision-making.  See U.S. Fish & Wildlife Serv., 592 U.S. at 267.

14

c.   Exemptions 6 and 7(c)

CBP properly applied Exemptions 6 and 7(c) to redact the personally identifiable information of CBP personnel and third parties from all three documents.  Specifically, CBP relied on these exemptions to withhold the names, telephone numbers, position identifiers, and unique alpha-numeric codes of CBP personnel and the names, dates of birth, identification numbers, photographs, and citizenship information of third parties.  Suzuki Decl. ¶ 46.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Courts apply a four-step inquiry to determine its applicability.  See Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873, 874 (D.C. Cir. 1989).  First, the information must be contained in personnel, medical, or "similar" files.  Id.  Information meets this threshold if it "applies to a particular individual."  U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982).  Next, the court assesses (1) any privacy interest that would be compromised by disclosure; (2) any public interest in the requested information; and (3) whether the privacy interest outweighs the public interest such that "disclosure would work a clearly unwarranted invasion of personal privacy."  Horner, 879 F.2d at 874.

Here, the withheld information qualifies as "similar" files because it consists of personally identifying details of specific individuals.  CBP personnel have a recognized privacy interest in their identities because, as Suzuki posits, disclosure of law-enforcement personnel's information may "create[] a safety threat and risk[] unwarranted attribution and attention" to them beyond their official duties.  Suzuki Decl. ¶ 51; see also Moore v. Bush, 601 F. Supp. 2d 6, 14 (D.D.C. 2009) ("Generally, government employees and officials, especially law enforcement personnel, have a privacy interest in protecting their identities because

15

disclosure 'could subject them to embarrassment and harassment in the conduct of their official duties and personal affairs.'" (citation omitted)).  Likewise, third parties have a privacy interest in controlling their personal information (including their names) and preventing its unrestricted disclosure.  Horner, 879 F.2d at 875; U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press ("Reps. Comm. II"), 489 U.S. 749, 763 (1989).  Malik does not identify any countervailing public interest or specify which personally identifiable information he seeks.  Without any such countervailing interest, Exemption 6 justifies withholding this information.  See Horner, 879 F.2d at 879 ("[S]omething, even a modest privacy interest, outweighs nothing every time.").

Exemption 7(c) provides an additional, independent basis for withholding this information.  This exemption protects "records or information compiled for law enforcement purposes" where disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7).  Exemption 7(c) is broader than Exemption 6, requiring only that records were compiled for a law enforcement purpose and that disclosure would "reasonably be expected" to be an "unwarranted" privacy intrusion.  See Reps. Comm. II, 489 U.S. at 756.

When an agency "specializes in law enforcement, its decision to invoke exemption 7 is entitled to deference."  Campbell v. U.S. Dep't of Just., 164 F.3d 20, 32 (D.C. Cir. 1998).  To justify withholding, the agency "must establish a rational 'nexus between the investigation and one of the agency's law enforcement duties,' and a connection between an 'individual or incident and a possible security risk or violation of federal law.'"  Id. at 32 (quoting Pratt v. Webster, 673 F.2d 408, 420–21 (D.C. Cir. 1982)).

CBP is a law-enforcement agency, see Barnard v. U.S. Dep't of Homeland Sec., 598 F. Supp. 2d 1, 14–16 (D.D.C. 2009), and Suzuki's declaration connects its law-enforcement

activities to the withheld information.  She explains that the GES assists CBP in screening

applicants for the Trusted Travelers Programs, which facilitate expedited entry for "pre-

approved," "low-risk travelers."  Suzuki Decl. ¶ 49; ECF 31-2 at 24.  The GES document and

Risk Assessment Worksheets contain information and analysis about Malik's eligibility for one

of these programs, including the results of background investigations.  Id. at 24–27.  For the

reasons discussed above, disclosing the information would constitute an unwarranted invasion of

privacy, and Malik has identified no public interest that would justify disclosure.  See Horner,

879 F.2d at 879.  Exemption 7(c) therefore properly applies.

> d.  Exemption 7(e)

Finally, CBP invoked Exemption 7(e), which exempts records compiled for law-

enforcement when their release "would disclose techniques and procedures for law enforcement

investigations or prosecutions[.]"  5 U.S.C. § 552(b)(7)(e).  This exemption "sets a relatively low

bar" for withholding:  "Rather than requiring a highly specific . . . showing [of] how the law will

be circumvented," the agency need only "demonstrate logically how the release of the requested

information might create a risk of circumvention of the law.'"  Blackwell v. FBI, 646 F.3d 37, 42

(D.C. Cir. 2011) (quoting Mayer Brown LLP v. IRS, 562 F.3d 1190, 1194 (D.C. Cir. 2009)).

While exemption 7(e) generally does not apply to "routine techniques and procedures already

well known to the public," Founding Church of Scientology of Wash., D.C., Inc. v. NSA, 610

F.2d 824, 832 n.67 (D.C. Cir. 1979) (citation omitted), it does protect techniques and procedures

that are not widely known and could be exploited by individuals seeking to evade law-

enforcement scrutiny.

CBP properly applied Exemption 7(e) to withhold two categories of information from the

relevant records: (1) the factors and priorities CBP considers when evaluating applicants for

Trusted Traveler Programs and (2) coded designators CBP uses to perform background checks, as well as the results of those reviews.  ECF 31-2 at 24–27.

As discussed above, CBP compiled these records as part of its law-enforcement function, satisfying the threshold requirement for Exemption 7.  Moreover, the redacted information consists of law enforcement techniques, and disclosing it could facilitate circumvention of the law.

First, the factors CBP considers when evaluating applicants for Trusted Traveler Programs are deliberately kept confidential to prevent ineligible individuals from manipulating the process to gain membership.  See Suzuki Decl. ¶ 58; ECF 31-2 at 24–26.  Public disclosure could enable bad actors to tailor their applications or conceal derogatory information to appear low risk.  See Suzuki Decl. ¶¶ 58–60.  Courts have recognized that Exemption 7(e) protects screening criteria in similar contexts.  See Ibrahim v. U.S. Dep't of State, 311 F. Supp. 3d 134, 143 (D.D.C. 2018) (concluding Exemption 7(e) applied to USCIS interview questions because disclosure could allow applicants to provide "strategic but inaccurate answers").

Second, CBP's coded designators and background check results may reveal internal shorthand used to identify individuals.  See Suzuki Decl. ¶¶ 61–62; ECF 31-2 at 26–27.  Disclosure of these codes could undermine CBP's enforcement and security priorities by allowing individuals to decipher how CBP evaluates risk or even manipulate database records.  See Suzuki Decl. ¶ 63.  Courts have consistently upheld the withholding of similar law enforcement codes under Exemption 7(e).  See Miller v. U.S. Dep't of Justice, 872 F. Supp. 2d 12, 28 (D.D.C. 2012) (upholding withholding of DEA identification numbers and codes under Exemption 7(e)); McRae v. U.S. Dep't of Just., 869 F. Supp. 2d 151, 169 (D.D.C. 2012) (finding Exemption 7(e) properly applied to "redacted codes, case numbers, and other computer

information" because disclosure "could reasonably be expected to risk circumvention of the law").

Because the withheld information details law enforcement techniques not publicly known and its release could reasonably enable individuals to bypass CBP's security measures, Exemption 7(e) properly applies.

\* \* \*

Since CBP's affidavit demonstrates an adequate search, Malik has not provided evidence of bad faith, and CBP has sufficiently justified its claimed exemptions, the Court will grant summary judgment in CBP's favor.

B. USCIS

Next, USCIS.  USCIS's declaration, submitted by Jarrod Panter, the Acting Associate Center Director and Chief FOIA Officer in the FOIA/Privacy Act Unit of the National Records Center ("NRC") of USCIS, details the agency's search for responsive records.  ECF 31-3 ("Panter Decl.").  Mr. Panter states that NRC determined that responsive records would likely be found in Malik's Alien-File ("A-File"), the official record of an individual's immigration history. Id. ¶¶ 20–21.  NRC searched DHS's file tracking system using Malik's name and date of birth and located two relevant A-Files.  Id. ¶ 22.

Beyond the A-Files, NRC directed searches in other relevant offices: the Office of Investigations, the Human Resources Operations Center ("HROC"), and the Office of Equal Opportunity and Inclusion.  Id. ¶ 23. HROC found two of Malik's personnel forms and explained that any other relevant records would have been transferred to the NARA due to the time elapsed since Malik's employment with USCIS.  Id.  Finally, per Malik's request, USCIS's Office of Information Technology searched the email accounts of specified individuals for a particular

time period, using the names "Aman," "Aman Malik," "Adam Malik," and "Attorney Adam Malik.'" Id. ¶ 24.

As a result of these efforts, USCIS processed a total of approximately 2,007 pages of records, releasing 741 in full and 1,237 in part, and withholding four pages in full. Id. ¶ 25. An additional 23 pages were withheld in full after consultation with another agency. Id.

### 1. Adequacy of USCIS's Search

Again, Malik does not argue USCIS's affidavit lacks necessary detail or that the search itself was inadequate. Instead, he reiterates that the results of the search evince agency bad faith. Specifically, he points to discrepancies between the A-File produced in response to this request and one provided in response to a FOIA request over a decade ago, the absence of documents explaining why his security investigation was never completed, and missing records from NARA, which he opines USCIS must still possess. See PSJ at 12–14.

These arguments fail because, as noted above, "[t]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." Iturralde, 315 F.3d at 315. Given that USCIS's declaration is nonconclusory, sufficiently detailed, and submitted in good faith, Malik's speculation about missing documents does not create a genuine issue of fact regarding the adequacy of USCIS's search.

### 2. Withholdings and Exemptions

As with CBP, Malik also contends that USCIS's extensive redactions suggest bad faith, challenging two specific withholdings: (1) a "Memo for the Record" and (2) a "SAVE Program" report dated March 4, 2008. PSJ at 14. While he has not established bad faith, USCIS has failed

to adequately justify its reliance on Exemption 7 to withhold portions of the "Memo for the Record."

    a.  The "Memo for the Record"

According to USCIS's <u>Vaughn</u> index, this six-page draft memorandum was prepared by USCIS's Office of Security and Integrity about Malik's employment application. ECF 31-4 ("USCIS <u>Vaughn</u> Index") at 61 (page numbers designated by CM/ECF); <u>see also</u> ECF 42 ("Def.'s Reply") at 9. USCIS withheld portions of it under Exemptions 5, 7(c), and 7(e)—it cited Exemption 5's deliberative-process privilege to withhold employees' "opinions and recommendations," Exemption 7(c) to redact a USCIS employee's name and third-party information, and Exemption 7(e) to withhold guidelines used in preparing this report. USCIS <u>Vaughn</u> Index at 61–64.

USCIS has adequately justified its Exemption 5 withholdings of the "pre-decisional" and "deliberative" "opinions and recommendations" expressed in the memo by explaining that their disclosure would "hinder the free flow of communication between employees . . . if they believed everything they stated was to be publicly released." <u>Id.</u> at 61–62. While this explanation is somewhat boilerplate, Malik has not responded to it, so the Court determines it sufficient. <u>See</u> <u>Hairston</u>, 915 F. Supp. 2d at 160; <u>CSX Transp., Inc.</u>, 82 F.3d at 482.

USCIS has not, however, met the threshold requirement for invoking Exemption 7—that the document was compiled for a law-enforcement purpose. As a "mixed-function agency" that "primarily engage[s] in civil administration" rather than law enforcement, USCIS is not entitled to deference on its decision to invoke Exemption 7. <u>See</u> <u>Am. C.L. Union of S. Cal. v. USCIS</u>, 133 F. Supp. 3d 234, 242 (D.D.C. 2015).

USCIS must show that the withheld information "relate[s] to . . . an enforcement proceeding." Clemente v. FBI, 867 F.3d 111, 119 (D.C. Cir. 2017) (quoting Jefferson v. U.S. Dep't of Just., 284 F.3d 172, 176 (D.C. Cir. 2002)). Panter's declaration asserts that, because "USCIS has responsibility to enforce federal immigration law . . . through its adjudications of applications and petitions submitted to USCIS by individuals seeking immigration benefits from the United States government," the produced records "were compiled for law enforcement purposes." Panter Decl. ¶ 42. But neither his declaration nor the Vaughn index establishes a nexus between law-enforcement functions USCIS may perform and the information withheld in this particular memo, which concerns an employment application.

Rather, the memo appears to relate to USCIS's internal human resources activities, not its immigration adjudications. Cf. Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs., 849 F. Supp. 2d 13, 27 (D.D.C. 2012) (recognizing that Exemption 7 does not cover "personnel files maintained in the ordinary course of monitoring employees' performance"). USCIS does not allege the memo includes, for example, the results of a background investigation into Malik, which might justify a law-enforcement nexus. See Morley v. CIA, 508 F.3d 1108, 1128–29 (D.C. Cir. 2007) ("Background investigations conducted to assess an applicant's qualifications . . . inherently related to law enforcement."). Instead, the withheld information is a USCIS employee's name, third-party data, and the guidelines used in preparing the report.

Because USCIS has not shown that Exemption 7 applies to these withholdings or explained that they are otherwise covered by Exemption 5, the Court will order the agency to submit a supplemental affidavit or Vaughn index clarifying how the withholdings of the "Memo for the Record" relate to law-enforcement functions and/or to the agency's independent Exemption 5 withholdings. See Sciacca v. FBI, 23 F. Supp. 3d 17, 22 (D.D.C. 2014) (denying

summary judgment where defendants failed to provide sufficient information to evaluate FOIA exemptions and ordering supplemental submissions).

                b.  The "SAVE Program" Report

USCIS invoked Exemptions 6 and 7(c) to redact parts of this report, which is described as containing "information . . . used to vet individuals and applicants with regard to eligibility for immigration benefits."  USCIS Vaughn Index at 66–67.  The Court need not determine whether this description establishes that this record was prepared for law-enforcement purposes under Exemption 7 because Exemption 6 independently justifies the redactions.  The Vaughn index explains that the report contained third-party information.  See id.  Because Malik did not provide the third party's consent or identify a public interest that would outweigh the privacy interest at stake, USCIS properly withheld the information under Exemption 6.  See Horner, 879 F.2d at 879.

* * *

Accordingly, while USCIS has conducted an adequate search and largely justified its withholdings, it has failed to establish that Exemption 7 applies to the "Memo for the Record," requiring further explanation from the agency.

      C.  ICE

ICE defends the adequacy of its search with a declaration from Fernando Pineiro, the FOIA Director of its FOIA Office.  ECF 31-5 ("Pineiro Decl.").  According to Mr. Pineiro, ICE reviewed Malik's requests and identified five program offices likely to have responsive records: Enforcement and Removal Operations ("ERO"), Homeland Security Investigations ("HSI"), the Office of Human Capital ("OHC"), the Office of the Chief Information Officer ("OCIO"), and

the Office of Professional Responsibility ("OPR"). ICE's FOIA Office directed each of these offices to conduct a search. Id. ¶ 21.

ERO, which oversees the arrest and removal of noncitizens, ICE detention operations, and detainee healthcare, handled Malik's request through its Information Disclosure Unit. Id. ¶ 22, 24–25. The unit forwarded the request to OHC, which then directed it to the San Antonio Field Office. Id. ¶¶ 25–26. There, a Mission Support Specialist searched that office's archived employee files for the terms "Malik" and "Aman" but found no responsive records. Id. ¶ 27.

HSI, the principal investigative arm of DHS, assigned a Management and Program Analyst to search its share drive database using two variations of Malik's name and his date of birth. Id. ¶¶ 22, 30. This search also yielded no results. Id. ¶ 31.

OHC, which is responsible for HR policies and workforce relations at ICE, referred Malik's request to OCIO. Id. ¶¶ 22, 33. A Business Analyst at OHC also searched the National Finance Center Database but located no responsive records. Id. ¶¶ 34–35.

OCIO, which provides IT services to ICE, conducted a comprehensive search of its electronic data systems. Id. ¶¶ 36, 38. It used multiple variations of Malik's name, professional titles, and ICE email addresses as search terms. Id. ¶¶ 39–40. Despite this broad search, OCIO found no records. Id. ¶ 41.

The only office to have any luck was OPR. OPR is responsible for upholding ICE's professional standards and houses a Personnel Security Division, which manages background investigations, polygraph examinations, and other evaluations for ICE employees and contractors. Id. ¶¶ 22, 43. The Section Chief of the Personnel Security Division searched OPR's system of records using the terms "Adam Malik" and "Aman Malik" and located 86 pages of responsive records, which were released to Malik. ¶¶ Id. ¶¶ 43–45, 48–49.

Malik repeats a familiar refrain, criticizing the agency for absent documents—such as "substantial portions" of his personnel file, his employment records at ICE, his background investigation and results, and a counterintelligence report—instead of challenging the sufficiency of its search methodology. PSJ at 15–16. The Court's response is the same: The adequacy of a FOIA search is determined by the reasonableness of the search itself, not whether it uncovers every document a requester expects. ICE's declaration is facially adequate, detailing the offices searched, the search terms used, and the individuals who conducted the searches. And Malik's speculation about missing documents does not rebut the presumption of good faith afforded to this declaration. See SafeCard Services, 926 F.2d at 1200.

Accordingly, because ICE's affidavit establish that it conducted a reasonable search and Malik offers no evidence of bad faith, summary judgment in ICE's favor is warranted. Additionally, because Malik does not challenge ICE's claimed exemptions, he effectively concedes their propriety. See Hairston, 915 F. Supp. 2d at 160; CSX Transp., Inc., 82 F.3d at 482.

### D. FBI

The FBI submits a declaration from Michael G. Seidel, Section Chief of the Record/Information Dissemination Section ("RIDS") of Information Management Division ("IMD") at the FBI. ECF 31-7 ("Seidel Decl."). Mr. Seidel explains that the FBI's general record-keeping system is the Central Records System ("CRS"), "an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI." Id. ¶ 35. The CRS is organized into automated indices, which FBI personnel can access through Sentinel, the FBI's case management system. Id. ¶ 38. The FBI searched the Sentinel indices (as well as Sentinel's legacy system) using the terms

"Adam Malik," "Aman Malik," "Attorney Malik," "Attorney Adam," "Malik Aman," and "Aman, Adam." Id. ¶ 43. These searches yielded 140 pages of responsive records, 130 of which the FBI released to Malik. Id. ¶ 18.

The FBI also went outside CRS, deploying its Human Resources Division, Security Division, Information Management Unit, Dallas Field Office, and Electronic Official Personnel Unit to search for records related to Malik's Special Agent and Contract Linguist applications. Id. ¶ 45. Most of these searches were unsuccessful, though the Human Resources Division found evidence that responsive files had existed at one time. Id. Seidel's declaration explains that these records were likely deleted due to the passage of time. Id. In 2015, when the Human Resources division implemented a new system, it removed from its digital records all information from before that year. Id. Similarly, the Information Management Unit's policy generally allowed the destruction of unsuccessful applicant files after five years. Id.

The Court is persuaded the FBI conducted an adequate search. Seidel's declaration describes the specific systems and departments searched for responsive documents and the search terms used. Once more, Malik attempts to cast doubt on the FBI's good faith based on records he claims should have been produced but were not. But the FBI explained that Malik's applicant records would no longer exist because of their age. Malik questions this account because part of the FBI's production included a letter from December 2005. PSJ at 23. The FBI's retention of some old records, however, does not prove that the agency has never destroyed *anything*.

Malik also claims that the FBI previously used his closed Special Agent application to train junior officers to conduct background checks and demands proof of this practice. PSJ at 9–10. But the Court cannot "authorize[] an improper . . . inquiry to uncover . . . hypothetical

records" based on speculation alone.  In re Clinton, 973 F.3d at 116.  Indeed, Malik himself

acknowledges the hypothetical nature of these records, noting that "there might have been" one

of his background investigations used to train junior officers.  Pl.'s Reply at 3.

In sum, the FBI is entitled to summary judgment because its affidavit shows it conduced

an adequate search, and Malik has failed to raise any evidence of bad faith.  And, because Malik

did not address FBI's claimed exemptions, they stand uncontested.  See Hairston, 915 F. Supp.

2d at 160; CSX Transp., Inc., 82 F.3d at 482.

E.  NARA

Finally, NARA submits a declaration from Karen Mellot, Assistant Director of Civilian

Personnel Records.  ECF 31-8 ("Mellott Decl.").  Her declaration explains that NARA's physical

records are held in Federal Records Centers and tracked in the Archives and Records Information

System ("ARCIS").  Id. ¶¶ 4–5, 11.  A search of ARCIS using proper identifying information

will provide the searcher with the location of the physical record within a Federal Record Center.

Id. ¶ 11.  In response to Malik's request, an Archives Technician searched ARCIS and located

Malik's 47-page Electronic Official Personnel File ("eOPF"), 43 pages of which were produced.

Id. ¶ 12.

Malik insists NARA's search was deficient because his eOPF did not include "crucial

items such as: annual evaluations, awards, records of courses taken, EOD (Entry on Duty) letters,

retirement plans and statements, accident reports, final determination of Plaintiff's security and

background investigation and various other pertinent documents."  PSJ at 23.  This argument is

no more persuasive the fifth time.  NARA's affidavit sufficiently details the agency's search, and

Malik has not provided any tangible evidence of bad faith.

As NARA's affidavit describes a proper search and Malik has not shown bad faith, summary judgment in NARA's favor is appropriate. Malik also does not dispute any of NARA's claimed exemptions. Once again, his failure to contest these exemptions amounts to a concession. See Hairston, 915 F. Supp. 2d at 160; CSX Transp., Inc., 82 F.3d at 482.

## IV.    Segregability and The FBI's Glomar Response

Finally, Malik does not address either the agencies' arguments that they adequately segregated all reasonably segregable information or the FBI's Glomar response, so those issues are also treated as conceded. See Hairston, 915 F. Supp. 2d at 160; CSX Transp., Inc., 82 F.3d at 482.

## V.    Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' [ECF 31] Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. It is further

**ORDERED** that Plaintiff's [ECF 37] Cross-Motion for Summary Judgment is DENIED. It is further

**ORDERED** that Defendant USCIS shall, by April 10, 2025, produce a supplemental affidavit or Vaughn index clarifying how the withholdings of the "Memo for the Record" relate to law-enforcement functions and/or to the agency's independent Exemption 5 withholdings. It is further

**ORDERED** that, upon producing these supplemental filings, Defendant USCIS may renew its motion for summary judgment as to the withholding of the "Memo for the Record."

Plaintiff shall oppose any such motion and/or renew his cross-motion for summary judgment as to USCIS within 30 days after Defendant USCIS's motion is filed.

**SO ORDERED**.[2]

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  March 11, 2025

_____

[2] In reaching this conclusion, the Court did not consider or rely on any of the declarations Defendants submitted under seal and ex parte, in camera.